J-S10001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.W., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.W., FATHER | : | No. 2113 EDA 2015 |

Appeal from the Order Entered June 17, 2015
In the Court of Common Pleas of Monroe County
Domestic Relations at No(s): CP-45-DP-0000064-2012

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and PLATT, J.*

MEMORANDUM BY GANTMAN, P.J.:                **FILED FEBRUARY 26, 2016**

Appellant, A.W. ("Father"), appeals from the order entered in the Monroe County Court of Common Pleas, which involuntarily terminated his parental rights to minor child, T.W.  We affirm.

In its written opinion, the trial court fully sets forth the relevant facts and procedural history of this case.[1]  Therefore, we will only briefly summarize them.  Mother and Father have had a volatile relationship since before T.W. was born in 2012.  The Monroe County Children and Youth Services ("CYS") became involved in this case on June 30, 2012, upon learning that T.W. had been injured when Father threw her, in her car seat, out of a vehicle during an argument with Mother.  T.W. was placed in CYS' custody on July 1, 2012, because Mother and Father were both incarcerated; T.W. has been in foster care since that time.  The court adjudicated T.W.

_____

[1] (**See** Trial Court Opinion, filed April 11, 2014, at 1-14) (Permanency/goal change appeal).

_____

*Retired Senior Judge assigned to the Superior Court.

dependent on August 3, 2012, with an initial permanency goal of reunification. Following several review hearings, the court changed the permanency goal to adoption on January 24, 2014. Mother filed an appeal from that order, which this Court affirmed on August 22, 2014. *See In re T.W.*, 106 A.3d 172 (Pa.Super. 2014) (unpublished memorandum).

Meanwhile, on December 3, 2013, CYS filed a petition for involuntary termination of the parental rights of Mother and Father. The court conducted multiple hearings on the termination petition throughout 2014 and 2015. On June 12, 2015, the court terminated Mother's and Father's parental rights to T.W.[2] Father timely filed on July 10, 2015, a *pro se* notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The court did not consider Father's appeal and Rule 1925(a) statement, as he was represented by counsel. Thereafter, counsel filed an amended notice of appeal and a Rule 1925(a)(2)(i) statement on July 17, 2015. Father also filed a *pro se* motion requesting a new hearing based on ineffective assistance of counsel, which the court dismissed. Father's counsel subsequently filed a petition to withdraw. The court granted counsel's petition and appointed new counsel to assist Father on appeal.

Father raises the following issues for our review:

WHERE FATHER IMMEDIATELY UNDERTOOK HIS FAMILY

---

[2] Mother filed a separate appeal from the order terminating her parental rights, which is docketed at No. 2188 EDA 2015 (J-S10002-16).

SERVICE PLAN OBJECTIVES, VISITED THE CHILD CONSISTENTLY, AND REFRAINED FROM DOMESTIC DISPUTES, DID THE TRIAL COURT ERR IN ITS FINDING THAT [CYS] PRESENTED CLEAR AND CONVINCING EVIDENCE THAT FATHER FAILED TO PERFORM PARENTAL DUTIES FOR A PERIOD OF MORE THAN SIX MONTHS?

WHERE CHILD WAS PLACED BECAUSE OF MOTHER'S ALLEGATIONS OF ABUSE OF THE CHILD DURING A DOMESTIC DISPUTE, MOTHER WAS CONVICTED OF FILING A FALSE POLICE REPORT, FATHER WAS CLEARED OF CHARGES, AND FATHER REFRAINED FROM INVOLVEMENT IN DOMESTIC DISPUTES, DID THE TRIAL COURT ERR IN ITS FINDING THAT [CYS] PRESENTED CLEAR AND CONVINCING EVIDENCE THAT FATHER FAILED TO REMEDY THE CONDITIONS AND CAUSES OF THE ALLEGED ABUSE, AND REMOVAL OF THE CHILD?

WHERE FATHER COMPLETED THE COUNSELING, PARENTING AND ANGER MANAGEMENT CLASSES IN THE FAMILY SERVICE PLAN, HAD TAKEN ADDITIONAL CLASSES ON HIS OWN, SEPARATED FROM MOTHER AND REFRAINED FROM DOMESTIC DISPUTES, DID THE TRIAL COURT ERR IN ITS FINDING THAT [CYS] PRESENTED CLEAR AND CONVINCING EVIDENCE THAT TERMINATION WAS IN THE BEST INTEREST OF THE CHILD?

WHERE [CYS'] WITNESS TESTIFIED TO A SIGNIFICANT BOND BETWEEN FATHER AND CHILD, FATHER TOOK STEPS TO MINIMIZE END-OF-VISIT TRAUMA TO THE CHILD, AND THE TRIAL COURT INSTEAD FOCUSED ON THE CHILD'S BOND WITH HER FOSTER PARENTS, DID THE TRIAL COURT ERR IN FINDING THAT TERMINATION OF FATHER'S RIGHTS BEST SERVED THE NEEDS AND WELFARE OF THE CHILD?

WHERE FATHER REFRAINED FROM INVOLVEMENT IN INCIDENTS OF DOMESTIC ABUSE AND CONTINUED TO COMPLY WITH THE FAMILY SERVICE PLAN, SEVERAL MONTHS PRIOR TO THE FILING OF THE FIRST TERMINATION PETITION, DID THE TRIAL COURT ERR IN CHARACTERIZING THESE EFFORTS AS "POST-PETITION"?

DID THE TRIAL COURT ERR WHERE ITS FINDINGS OF

FACT WERE NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE?

DID THE TRIAL COURT ERR IN FAILING TO DETERMINE THAT FATHER WAS REPRESENTED BY INEFFECTIVE COUNSEL, WHERE FATHER WAS PREJUDICED BY COUNSEL'S NUMEROUS ERRORS, INCLUDING FAILURE TO ADEQUATELY INVESTIGATE THE ASSERTIONS MADE BY CYS, AND GATHERING EVIDENCE WHICH COULD REBUFF THOSE ASSERTIONS?

(Father's Brief at 3-4).

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by

clear and convincing evidence the existence of grounds for doing so.

> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

CYS sought involuntary termination of Father's parental rights on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental

- 5 -

well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

"Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P., supra* at 1117.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his…parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

Termination under Section 2511(a)(1) involves the following:

> To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
> > Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.
>
> > Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his…conduct; (2) the post-

- 7 -

abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted). Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his…parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* at 340. The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in the case of *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued

incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Z.P., supra* at 1118.

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for [twelve] months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003).

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond,

paying close attention to the effect on the child of permanently severing the bond." *Id.* at 520. Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have his parental rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert [himself] to take and maintain a place of importance in the child's life.

- 10 -

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his…ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

*In re B.,N.M., supra* at 855 (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of his…child is converted, upon the failure to fulfill his…parental duties, to the child's right to have proper parenting and fulfillment of his…potential in a permanent, healthy, safe environment." *Id.* at 856.

Importantly, neither Section 2511(a) nor Section 2511(b) requires a court to consider at the termination stage, whether an agency provided a parent with reasonable efforts aimed at reunifying the parent with his child prior to the agency petitioning for termination of parental rights. *In re D.C.D.*, ___ Pa.___, 105 A.3d 662, 672 (2014). An agency's failure to provide reasonable efforts to a parent does not prohibit the court from granting a petition to terminate parental rights under Section 2511. *Id.* at ___, 105 A.3d at 675.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned oral opinion of the Honorable Jonathan Mark, we conclude Father's issues one through six merit no relief. The trial

- 11 -

court's oral opinion comprehensively discusses and properly disposes of these questions presented. (**See** N.T. Oral Opinion, 6/12/15, at 10-42 and attached addendum) (finding: at time of termination hearing, T.W. had been in CYS' care for approximately 33 months; Mother and Father had volatile relationship that included criminal charges, protections from abuse ("PFA"), and domestic issues; underlying issues between Mother and Father have not been resolved; T.W.'s safety, health and well-being are paramount concerns and must be ensured; neither Mother nor Father has demonstrated current ability to provide requisite assurance of T.W.'s safety; Father consistently fought with CYS over visitations, regarding protocol and confirming appointments; throughout entire case, Father failed to adhere to court's advisements; under Section 2511(a)(1), Mother and Father made progress towards some of goals but failed to take necessary steps toward reunification with T.W.; Mother and Father failed to perform parental duties for more than six months, as both parents were incarcerated and spent majority of time fighting with each other; CYS met statutory grounds for termination under subsection (a)(1); Mother and Father refused to provide essential parental care, control, and assistance to T.W.; CYS established grounds for termination under Section 2511(a)(2); grounds for termination also existed under Section 2511(a)(8), because T.W. had been removed from Mother and Father's care for at least twelve months, condition that led to T.W.'s removal still exists, and termination of Mother and Father's

parental rights best serves needs and welfare of T.W.; court properly considered Mother's and Father's post-petition efforts as grounds for termination because termination petition was filed in December 2013, and first termination hearing was not held until one year later; reunification efforts are not valid consideration under subsections (a)(1), (a)(2), and (a)(8); T.W.'s foster family provided love, care, companionship and support that Section 2511(b) requires, while Mother and Father were busy filing criminal charges and PFAs against each other and exhibiting pathological codependency; T.W. has strong bond with foster family and severing that bond would be detrimental to her; T.W. has not developed any traditional bond with Mother and Father, as she spent her first several months in hospital and has had only supervised visits with parents for most of her life; only bond T.W. has with Mother and Father is biological; severing T.W.'s bond with Mother and Father pales in comparison to severing bond with foster parents, who wish to adopt T.W.; safety concerns also exist with Mother's and Father's care of T.W.; CYS established grounds for termination under subsection (b); current placement goal of adoption remains appropriate and necessary).  The record supports the court's decision; therefore, we have no reason to disturb it.  Accordingly, we affirm as to Father's issues one through six on the basis of the court's oral opinion issued at the termination proceeding.

In his final claim, Father argues trial counsel was ineffective

throughout the proceedings, which severely prejudiced Father. Specifically, Father asserts trial counsel failed to object to hearsay testimony regarding a videotape that was not introduced at the hearing. Father insists this example is only one of "many" instances where incompetent evidence made its way into the record because counsel failed to raise a proper objection at the time. Father concludes the court used this evidence to determine CYS had met its clear and convincing burden, and he is entitled to a new hearing. We disagree.

"Pennsylvania statutes do not require counsel in termination proceedings, although Pennsylvania case law does…and flowing from this it is presumed that counsel would and should be effective." *In re Adoption of T.M.F.*, 573 A.2d 1035, 1040 (Pa.Super. 1990) (*en banc*), *appeal denied*, 527 Pa. 634, 592 A.2d 1301 (1990). This Court evaluates ineffectiveness allegations in termination proceedings as follows:

> In the context of a termination proceeding, the best approach…is the fundamental fairness doctrine whereby, in the exercise of its broad scope of review, an allegation of ineffectiveness of counsel on appeal would result in a review by this Court of the total record with a determination to be made whether on the whole, the parties received a fair hearing, the proof supports the decree by the standard of clear and convincing evidence, and upon review of counsel's alleged ineffectiveness, any failure of his stewardship was the cause of a decree of termination. Mere assertion of ineffectiveness of counsel is not the basis of a remand or rehearing, and despite a finding of ineffectiveness on one or more aspects of the case, if the result would unlikely have been different despite a more perfect stewardship, the decree must stand.

- 14 -

*Id.* at 1044. Thus, the "fundamentally fair hearing" right to effective assistance of counsel in civil termination cases is more limited than the right to effective assistance of counsel in criminal cases. *In re J.T.*, 983 A.2d 771, 775 (Pa.Super. 2009). If competent evidence of record supports the termination decree, it should stand. *Id.*

A party alleging ineffectiveness in termination matters must "demonstrate such ineffectiveness so undermined the truth determining process that no reliable adjudication…could have been made." *Matter of J.P.*, 573 A.2d 1057, 1066 (Pa.Super. 1990) (*en banc*). Additionally, the party alleging ineffective assistance of counsel in this context "must show by clear and convincing evidence that it is more likely than not that the result would have been different, absent the ineffectiveness." *In re K.D.*, 871 A.2d 823, 827 (Pa.Super. 2005), *appeal denied*, 586 Pa. 713, 889 A.2d 1216 (2005).

Instantly, Father did not adequately develop his claim regarding counsel's ineffectiveness. Nevertheless, even if properly articulated, Father cannot demonstrate that, absent the alleged ineffectiveness, the outcome of the termination proceedings would have been different. *See id.* Competent evidence of record supported the termination of Father's parental rights. *See In re J.T., supra*. Thus, Father's ineffectiveness claim merits no relief. Accordingly, we affirm the court's order terminating Father's parental rights.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/26/2016

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

IN THE INTEREST OF:    :  NO. 64 DP 2012
                      :  NO. 48 OCA 2013
                      :

T. W.,
A Minor               :  HEARING

TRANSCRIPT OF PROCEEDINGS



BEFORE:    Jonathan Mark, Judge

DATE:      June 12, 2015
           9:30 a.m.

PLACE:     Courtroom No. 1
           Monroe County Courthouse
           Stroudsburg, Pennsylvania

APPEARANCES:

        ELIZABETH BENSINGER WEEKES, ESQUIRE
        529 Sarah Street
        Stroudsburg, Pennsylvania 18360
           -- Solicitor

        DONALD M. LEETH, ESQUIRE
        818 Ann Street
        Stroudsburg, Pennsylvania 18360
           -- On behalf of Mother

        ERIC L. HAMILL, ESQUIRE
        501 Broad Street, Suite #3
        Milford, Pennsylvania 18337
           -- On behalf of Father

========================================================



Proceedings stenographically recorded by
Yvestre M. Torres, OCR



## ADDENDUM

ATTACHED TO THE TRANSCRIPT:

1.  OPINION IN SUPPORT OF ORDER PURSUANT To Pa. R.A.P. 1925(a)

2.  ADDENDUM TO ANNOUNCEMENT HEARING

3.  NON-PRECEDENTIAL DECISION

P R O C E E D I N G S

THE COURT: Good morning, everybody.

MS. WEEKES: Good morning, Your Honor.

MR. HAMILL: Good morning, Your Honor.

THE COURT: We are here now as scheduled to announce a decision in both of the cases involving Time Warner, the dependent in this case, and the termination of parental rights case.

This case has been around for a while, so I'm going to take a little bit of time to make sure that I try to be as clear as possible. We will get to this in more detail later, but the last hearing in this case was at the end of April, and the parties were given, I think, three or four weeks, whatever it was, to file some briefs, some memoranda, and post-submmission filing.

Then even though this was a case involving a child, this is a highly-contested, long-running dependency case, relatively long-running termination of parental rights case, and so the Court wanted to take a little bit of time to look at some of the legal issues and the facts before making a decision.

That coupled with the Court's schedule, including federal trials and other matters and personal matters, made it so that the extra month

from the time the briefs were in until now elapse.

So today I will announce both decisions. Orders will be issued today or tomorrow, at the latest, depending on whether the computer system is cooperating with us or not.

At the last hearing, this case was at the end of April. The evidence was concluded. I do not anticipate taking any evidence today or hearing any argument today. I will note that the parents are here with their respective attorneys. So Father is here, I guess, with one of his two attorneys. Right, Mr. Hamill?

MR. HAMILL: Correct.

THE COURT: His second attorney, I guess, is not here, but I'm not sure if we really need two for this. I believe the guardian ad litem is also not present. I know that the guardian is on vacation, and because it was -- we tried to schedule this, I didn't know if she was going to have someone else sit here to listen. But I know she was interested in hearing -- according to what was provided to my office -- the outcome, and, of course, a transcript, if necessary. But everybody else is here. The agency is here, represented by several people, including a couple of supervisors.

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

Now, after the last hearing, I believe I indicated the parties were going to need to file memoranda and post-submission filings. Mother, Father and Monroe County Children and Youth Services -- who for the rest of this announcement, unless I slip, I will refer to as the agency -- filed briefs. Father and the agency included in their submission some findings of fact.

In addition, Father submitted, by praecipe, an additional document, which I assume he was wanting to make of record as part of the evidentiary record, and that was, I believe, a magisterial district judge's order for document -- at least some kind of document indication that a case that has been filed against him, and had been mentioned during termination hearing, had been dismissed, and that is in the file. I don't know if it was distributed to other parties or not, but it is in the file.

The Defendant in the matter in this case -- the Defendant in this case, I should say, has an open -- has been opened in the records of Monroe County Children and Youth Services since June 30, 2012, and this Court shortly thereafter. It is, as indicated, a much litigated, highly-contested case and has been all along.

In early 2014, an order was issued that changed the goal from reunification to adoption with a concurrent goal of reunification. And at that point, Mother appealed. In response to the appeal, several things were filed of record. One of which was I issued an opinion on April 11, 2014, which I will from this point on hopefully remember to refer to as the appeal petition.

Then on August 22, 2014, the Superior Court issued a memorandum opinion affirming the goal change order and permanency review order. And both opinions are in the record and filed in this matter, both here and Superior Court, and I know all the attorneys, and hopefully the parties, have copies as well.

I am going to right now, so that we understand, incorporate both opinions into this announcement by reference. At the end of this announcement, I will, as indicated, issue the orders to make the findings that are required. However, I will be doing this orally today so that no more time needs to go by. And I will, therefore, have an opinion.

So what I have done is I have prepared an addendum that will be attached to the transcript, if anyone orders a transcript or if there is an appeal,

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

as I anticipate there will be regardless of the outcome, either by one or both of the parents or the agency.

The addendum that I am about to hand out to you now will be attached to the transcript, and will be given to the court reporter to keep with the records of this case. So if counsel will want to approach, I will give you the addendum. There you go. We will have the extra one for the guardian. We'll make sure that we leave one for Ms. Cerato.

In any event, the addendum is not in the form of an opinion but procedural and factual history. The addendum is the law that I had applied to both the termination of parental rights proceeding, and the decision you'll hear in that case. And it also references the standards and law that I applied in the permanency review hearing and issued a permanency review order.

Because I do anticipate that there will be an appeal regardless of the outcome today filed by at least some party, it also references the appellant standard of review, which was listed and summarized in detail in the appeal petition previously filed.

For convenience and ease of reference, I am also going to include the prior opinions -- both my

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

appeal opinion and the Superior Court's opinion -- as addenda to any transcript, and we will get those to the court reporter.

Instead of giving a draft out of the Court's -- my chambers' computer system, we will include a copy that is time stamped in the file in the records of this case.

The factual and procedural history of the dependency case and the early portion of the termination of parental rights case were captured in the prior opinion, and so I am not going to repeat them in detail here.

In addition, the agency and Father have submitted findings of fact. With respect to the agency's findings of fact, I affirm but I do not adopt findings 1 through 12 and believe that they are supported by competent evidence in the record.

I said I wasn't going to recount the history in detail or in full, but my remarks today do need to be put in context, so a very quick summary, again, incorporating everything that was composed in the long opinion -- appeal opinion that was written and the Superior Court's opinion. I will just note quickly the following:

T. W. was born in 2012, and she is

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

now three years old. She was premature, and had to stay in the hospital for an extended period after her birth as a result of a heart condition that was required to be monitored. For still unexplained reasons, neither parent mentioned that when T.W. came into care.

T.W. first came to the attention of the agency on June 30th of 2012, and the referral, which we have discussed and has been documented many times, was that from Mother. She had accused Father of taking T.W. out of the family van and throwing her in the car seat from the van on the road where T.W. was injured.

T.W. was taken to Pocono Medical Center and then to a regional facility for evaluation and workup. As I have detailed in the appeal petition, despite the parents' protestation to the contrary, injuries were observed and reported by medical personnel from both hospitals, although luckily not as severe -- the injury was not as severe as first thought by doctors at Pocono Medical Center.

There were both old and new injuries that were ultimately identified. Significantly, the injuries are still, for the most part, unexplained by the parents. While there have been some suggestions,

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

some innuendo, some guesses, and some information that could possibly be an explanation, some of which was confirmed by one parent or another, all of those details are in the prior opinion. As we sit here today, there still really is no specific explanation for all the injuries, old and new, that were observed.

T.W. came into care -- not exactly as the parties have characterized in their filing, some of which were cursory, although Mother's were much more detailed than others -- but because after Mother had accused Father of throwing T.W. and injuring her, Father was arrested and then jailed.

Mother, who was not honest about her criminal history, had a warrant out for her arrest. And when Mother was arrested on the outstanding warrant from another state is when T.W. came into care. That was July 1, 2012, just shy of three years ago from today. She has been in care continuously in the same pre-adopt foster home ever since.

To measure the time frame by traditional benchmarks, T.W. has been in care for the following length of time: First, she has been in care 17 months as of the date the termination of parental rights petition was filed in this matter.

*Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."*

She was in care 21 months as of the date the goal in this case was changed. And she has been in care for 23 months as of the time Mother filed the appeal in the dependency case. As of the final termination of parental rights hearing, T.W. has been in care for 33 months, add another month or two for briefs and the time the Court needed to put this announcement together, and she is, as noted, almost three years in care.

Again, you know, I have detailed the background and the reasons why she came into care and the reasons why as of the date the appeal petition was filed, she remained in care, but really have to recount something so that the decision today do read correctly in context.

So I am going to reference two things that, I think, are relatively undisputed, and I am just going to quote or paraphrase some of the passages, if you will, from the appeal petition. So, first, this is a case where the parents had historically a very volatile relationship, and that's kind of putting it mildly, both before and after T.W. was born, and both before and after T.W. came into care.

All that was detailed in the opinion. But the time from the shelter care hearing through the

*Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."*

time when Mother took the appeal, was really marked with criminal, protection from abuse, other filings back and forth between the parties, neither party really being honest and upfront about the domestic filing and issues between them or their relationship.

It was also marked with Mother admitting, or at least saying to authorities, that she lied about Father throwing T.W., which resulted in charges against Mother, or at least amended charges, for which she ultimately pled guilty, and the list goes on and on.

So, in the opinion that I wrote -- the appeal opinion -- the following passages appear on pages 18 and 19: The reasons why we changed the goal to adoption, with a concurrent goal of reunification are presaged by and captured in our recitation of the facts of this case.

In a nutshell -- and I am going to use her name because I used initials in the opinion -- T.W., while still a premature and fragile infant, was dropped, injured, and by both parents' account of the incident, the subject of a roadside tug-of-war between Mother and Father.

The underlying problem that caused T.W. to be put in peril and injured is the well-documented,

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

deep-seated history of violence between Mother and Father that is embedded in their relationship and presents a danger to others, especially T.W.

Despite anger management classes, parenting classes, services from the agency, counseling received from a clinician, a minister and a pregnancy crisis group of her own choosing, as well as involvement in the criminal justice system and PFA court, Mother has to date been unable to extricate herself from her relationship with Father, protect herself from Father, restrain her own violent and abusive tendencies, stop the alternating pattern of being a victim and then a perpetrator of abuse, or stop her pathological lying.

In fact, based on the evidence, Mother and Father's history, and the courtroom demeanor of both parents, we firmly believe the parties are together and not, as Mom testified, estranged. Simply put, Mother has not demonstrated necessary protective capacities, and the reasons that caused T.W. to come into care have not, despite Mother's protestations to the contrary, been alleviated.

Continued on page 20: Under the settled law summarized in the appeal opinion, the applicable standard is the best interests of the child. Under

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

14

equally well-established law, T.W.'s safety, permanency and well-being are paramount, and these considerations trump either parents' needs, desires and beliefs.

Based on our longitudinal view of the evidence, our in-court observations of Mother on and off the witness stand, Mother's overall parenting history, and the facts presented by the agency, the well-reasoned and articulated positions of the agency and T.W.'s guardian ad litem, and the applicable law, it was and is still obvious to us that Mother has simply not progressed to the point where T.W. could safety be returned to her.

That determination, coupled with T.W.'s needs and welfare, the amount of time T.W. has been in care, and the firmly entrenched and oft-quoted doctrine that "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting," led us inexorably to the conclusion that the goal change we ordered was in T.W.'s best interest.

Finally, on pages 25 and 26 of the case -- I'm sorry -- of the appeal opinion, T.W.'s health, safety and well-being are the paramount concerns, and her best interest is the guide star.

*Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."*

T.W.'s safety must be ensured regardless of whether she was injured in the roadside incident, which scenario could be supported by at least Father's evidence; in the incident where Mother dropped her, which scenario could be supported by the statements of either or both parents; or in some prior incident which has yet to be explained by the parents, but that would be equally problematic.

In fact, T.W.'s safety must be assured even if Mother's no-injury assertion is accepted. Neither parent has demonstrated the current ability to provide the requisite assurance.

In this regard, it cannot be emphasized enough that, under both parents' versions of the June 30, 2012 incident, T.W. came into care because the volatile nature of Mother and Father's relationship shockingly caused them to become embroiled in an argument that led them to literally play a game of tug-of-war with T.W. in a car seat at the side of a public road.

While T.W. is now physically safe, the tug-of-war between the parents continues, at times literally and at times figuratively, and the underlying issues that cause their battles have not been resolved.

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

That, of course, was all as of the time that the appeal opinion was written and as of the last permanency review and goal change hearing that had been conducted in the case. Now, I read passages that have negative implications to be true to the facts and also to balance, as indicated, the opinion and as the parents have argued strenuously.

Both parents did make progress toward their goals. In fact, in the proposed findings that Children and Youth submitted, progress was noted, and Mother's progress, I think, was noted in most, if not all, of the review hearing orders up to the point when the appeal was filed and afterwards as well.

That continued in terms of checking off goals throughout the time while the case was on appeal and afterwards throughout the termination of parental rights hearing. Procedurally, there was an overlap between the goal change request and proceeding and the termination of parental rights proceeding.

And I think it's captured in the opinion, but just quickly because there is a gap in this case that needs to be explained, and probably all of us need to do some self-examination on it, and that is this: As the dependency case progressed into the

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

fall of 2013, the matter was scheduled to be reviewed by our dependency master pursuant to our three-month review protocol in September of 2013.

The agency appeared and objected to the jurisdiction of the master, and asked the Court to hear the case, so a hearing was scheduled. The guardian ad litem then asked for some additional time to subpoena records from other states because of the issues that Mother had there that are referenced and documented in the exhibits and in the appeal opinion, and the notes of testimony that are cited in that opinion.

So a new hearing date was scheduled, and that was for December of 2013. I didn't write down the specific day. While all that was going on, and the guardian was gathering records, the agency filed a termination of parental rights petition. That petition was filed and because the date can be significant, depending on whose argument we look at, the termination petition was filed on December 3, 2013.

So at that point, we had not yet had the goal change hearing. And there were two subsequent review hearings where the change of goal was addressed. And so it sort of begs the question why

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

we didn't include the termination of parental rights petition in those hearings, and the simple question -- the simple answer, which is contained in the footnote of page 9 of the appeal petition, was that at the time the original master's hearing was scheduled, we had not yet been to the magic 15-month mark in the case, the agency did not ask for the termination of parental rights, and the parents had been making some progress, as had been indicated in the orders; although, there were a whole host of problems, as even my handful of passages that I read, indicated.

Then quite frankly, the parties asked since the goal change had already been set up and started, and the agency wanted to get itself together with respect to termination, and Mother and Father wanting to put evidence and witnesses together, they ask that the hearing not be heard together. And even though it's best practice to file the two together, there were no concurrent filing, if you will, so they started a goal change hearing.

The order that I issued changed the goal. I did set a hearing on termination petition, but then by request from all parties, I agreed to postpone that hearing until after the appeal was filed.

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

Looking back that was probably something that should not have been done. It, you know, -- the reason that there is a best practice now with filing at a proper point in a dependency case towards a goal change and a termination petition simultaneously is so you don't have the time that you have here. You know, when you do one and you wait for an appeal and then come back and have the result.

In any event, that happened at the time -- in real time going forward. There were or appeared to be rational reasons and bases for doing so. But with the look back, it probably shouldn't have been done that way.

In any event, the appeal was pursued. The appeal opinion that I talked about was written. The parties participated in the appeal, so did the guardian ad litem, and ultimately, as indicated, the Superior Court -- the Superior Court affirmed the goal change.

So, after the goal change order -- I'm sorry -- after the Superior Court's order came down, and the appeal period -- the period for filing the petition for the allowance of an appeal from the Supreme Court expired, a termination petition -- the termination hearing scheduled on the termination

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

petition at that point had been filed almost a year before the first hearing was scheduled; although, again, it's not what the Court wanted.

The hearing was scheduled in accordance with, you know, attorney schedules and that included a three-and-a-half month delay to accommodate the schedules of the attorneys for Father between the December of 2014 period and the March 2015 hearing.

So there were review hearings while the appeal was going on, and then the termination of parental rights and corollary dependency review and permanency placement review hearing were held in December of last year and March of this year.

Not much had changed, although, the parties still had visits and continually visited; although, visitation had been very, very problematic, both with respect to the agency's side and with respect to the parents, especially with respect to Father.

It came to light that during the -- somewhere during the appeal period and between the last review hearing before the Court and then the commencement of the termination and review hearing in December of 2014, that despite the concurrent goal of reunification, the agency admittedly stopped doing what was in the court order and didn't move at all

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

towards reunification.

That shocking revelation came from the stand from one of the caseworkers, and it was borne out by the documents that were submitted, and also by the cross-examination that was conducted by counsel for both parents. So the case proceeded to termination hearing with all parties calling multiple witnesses and making arguments and filing briefs on several legal issues and then the post-hearing submission that I talked about.

I do need to note that the parties continued to make some progress, or at least keep checking off some of the black and white stated goals in the plan. However, there were several things that were problematic:

One, again, visitation, which became a matter of principles between the agency and Father, especially very unfortunately in this case, was just pot marked with issues even to the point where we had to have a conference and figure out the e-mail protocol and confirm appointments, and even then there were some problems, and, you know, the parents, especially Father, wants to assess and have the Court assess and pass blame. That's not what the Court does in these cases.

Pursuant to 43 J.D.R.C.P. Rule 260c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

On the other hand, I can say that, you know, Father throughout this whole procedure would not fully adhere to the advisement of the Court, and I am assuming from his attorney, that at some point you have to parent, I guess put principles aside, and you have to work towards reunification rather than trying to catch every miscue that the agency does.

On the other hand, it's pretty clear that the agency didn't comply with the secondary portion of the concurrent goal which was reunification. However, it should be noted that the agency did, of course, pursue the primary first of the concurrent goals which was adoption.

In any event, as I indicated before, even up to the termination of parental rights hearing, there still had been no full explanation for the injury. Mother had done well visiting, except right before the hearing, where she did not appear for the last two or three visits. I am not sure about since then.

Father was working and doing some other things. However, I know he continued his principle fight with the agency, at times casting dispersions on the agency and even the Court. But that is how Father had elected to play this case, despite the best attempts of the Court and initially the best

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

attempts of the agency to try to get him to focus on parenting and T.W.'s best interest.

So at the conclusion of the hearing, when I looked at the briefs, the parties had a pretty polarized position. The guardian ad litem articulated a very cogent reason why rights should be terminated, why the dependency should be continued and the goal should be maintained as adoption.

Father and Mother articulated their beliefs that because the agency had not worked towards the concurrent goal, that either as a matter of law or fact or discretion, that termination should not be granted, and the impasse continued.

So I will say this: This is not a case where it is the shining moment for any of us. This is not a case that I'm going to hold up in my repertoire as one where I guided the parties in the best interest of the child in the best way possible. I am not going to sit here and cast dispersions on anyone else. Everybody else hopefully has engaged in that same self-reflection.

From continuing these cases, you know -- through continuance requests and appeals, we tried to give the parents some post-petition chance to finally get it and make some progress, to not fully following

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

the court orders, to principle arguments against the agency, the Court or just arguments, whether they are credible or not, and, of course, with respect to the parents quite frankly not being candid in their testimony, and that especially is one for Mother.

I hate saying no to things, but I've learned now that this case is going to look much different in a cold two-dimensional record on appeal than it did to all of us who sat in the courtroom and listened to the evidence, watched the witnesses, observed the parties as the case went along. So, unfortunately, I have to make observations such as those.

I want to make this other observation as well: It is that the attorneys, who really zealously advocated and fought for their clients can't testify for clients, and I'm going to leave the factual portion as this: Mother and Father wanted to fight. They wanted to fight the agency, they wanted to put this in a position for appeal, whatever. That was then obvious to me.

In the end, I don't have the transcript. No one has requested one yet, but I think you're going to come back and you're going to see that there was a lot of venom, quite frankly on both sides, and in the final analysis neither parent sat on that stand,

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

either in this courtroom because we were here for one hearing, or in my courtroom, No. 3, and told me in any detail with any feeling or emotion about how they had any -- about their feelings towards their bond and other emotional and spiritual feelings towards their daughter.

That's understandable after the passage of time. It was disturbing to me then, and it's disturbing to me now. So now, we have to apply all of this to the law, and I've laid it out here in the addendum, and I will note a couple of things.

There was a legal issue that I asked the parties to address early on in the termination, and that is given the appeal filed by Mother and the several requests for continuance asked for by counsel for Father, did the statutory provision that precluded the Court from considering post-petition efforts by the parents with respect to some, but not all of the bases, were grounds for termination?

Did that coalesce? Did that stop it? Did that create some type of exception to the rule? And I got some briefs from the parties. I think the parties' research was the same as mine. There was no real specific case on this issue, other than it is pretty clear that the statutory provision against

considering efforts initiated after the given notice of filing a petition remained, and it has been enforced consistently by our courts.

It makes sense because -- at least under the current cases and current protocols and rules for processing the dependency and termination cases -- and that is because at some point when a petition is filed in accordance with the current rule, and a child is in care, by definition in the one that's been cited, for more than a year, it makes sense that we need to look at the child and not put our main focus on the parent. And so we have to have some kind of a cut off and this is what our legislature had decided -- one second.

(Off the record.)

(Back on the record.)

THE COURT: I sat through a bunch of hearings, and I am not just going to -- this is a very important case. So I don't want to speed through, but the president judge is not in today, and I have to attend to a matter in about five minutes and then come back.

In any event, I have concluded that -- and no party has pointed me in a different direction -- that the rule still applies, even though the petition

*Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."*

was filed in December of 2013, and the custody appeal was continued. We didn't have the first hearing until a year later, and then it didn't conclude because of the other requests until three or four months after that.

Now, that brings us to the issue of does the rule apply in this case? The agency asked for termination of parental rights on four grounds, and they were grounds set forth in 23 Pa C.S.A Section 2511(a) 1, 2, 5 and 8.

The rule on its face applies to the grounds stated as 1 and 8. It does not apply with respect to 2 and 5. With respect to the grounds under Subsections 1 and 8, the parties have taken the position that all of their efforts were initiated prior to the filing of the termination petition. And so the rule doesn't have application to the presented facts.

And that's one that I've looked at and thought about carefully, and I don't agree with that, and here is why: To be sure, the parties were involved in this case and had actually made some progress towards many, in some instances, or at least some of the goals even early on in the case.

But the fact that you were starting to make

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

some progress, but hadn't done other things that are necessary or that you might have generally tried to get your child back doesn't mean that some specific effort that you're required to make -- and if you wait until after the petition is filed, doesn't mean you get an exception to the rule.

Here is an example: The example in this case is one of the things that the parties wanted the Court and the agency to believe was that they had separated themselves now finally. We're not going to be together, but up until just before the termination of parental rights hearing, there was really not much indication of that because of the continuous problems between them.

So at some point there were fewer problems, but, you know, we all have to have some objective manifestation. Well, a divorce complaint wasn't filed until a month after the termination of parental rights case was filed, and the fact that the parties might have started to stop physically abusing each other before the termination petition was filed doesn't mean that because they ultimately did that months or years after it was filed, that they met the threshold.

So I do not agree that while -- let me back

*Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."*

up -- while certainly some progress that the parties made towards the plan goal were achieved prior to filing the termination, while some were starting prior and completed after, there were several things that still remained unsatisfied or they were early only commenced or commenced in earnest after the petition was filed.

The appeal was filed to give more time on those things, and the other requests for continuances were made, presumably to give more time to work towards reunification as well. That includes the legal and physical separation between the parties. That includes the still unexplained injury of T.W., and that includes a point where the parties were looking for and asking for something other than the supervised visits that they have had because they couldn't get past having problems with those. So with respect to 1 and 8 -- Subsections 1 and 8 -- I believe the rule is applied. With respect to 2 and 5, it is not.

The second issue I asked the parties to address -- and I'll talk about this, and I'll take up the other matter and I'll come back -- is the issue framed by the opinion that Justice Baer wrote in the case of In Re: D.C.D., which I had pointed out that

*Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."*

the parties in that case did not yet have an A.3d cite, and everybody had briefs and discussed that.

The issue is that what affect, if any, did the fact that the agency admittedly didn't follow the order with respect to the concurrent goal, secondary goal of reunification, have on this case, either as a legal matter, factual matter or discretionary.

I think we've all read that opinion, and I've had a chance to read -- there's another one that's been cited. There's another opinion by the Superior Court that addresses a very similar issue with the cite In Re: D.C.D. Here is my analysis of that issue:

One, I think that the Court -- and on this issue, I believe it was unanimous, although there was an occurring opinion on a different matter -- indicated that the compliance with court orders is not something that is statutorily required, at least not under all the grounds for termination.

And so in terms of that, I believe, as you will see in the addendum, that the case applies, and reunification efforts were not a consideration with respect to Subsections (a)(2), (a)(8) and (a)(1). However, I do conclude that the efforts or lack of efforts made towards reunification by the agency does

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

come into play, specifically under Section (a)(5) -- Subsection (a)(5).

Even In Re: D.C.D., and the subsequent Superior Court decision, I have also indicated that -- and I think that both parents argued -- that the Court can consider them in exercising its discretion with respect to actions or omissions of the parents with respect to other grounds, but there's not a statutory requirement.

Finally, while the considerations on D.C.D. and the subsequent Superior Court case made it explicitly clear that the remedy, if there is otherwise a properly supported termination motion, is not to deny the motion, but it is to make a finding that would remove from the agency the ability to get federal reimbursement and funding for a particular case.

The parents, obviously, the way they wrote their briefs, think that the policy ought to be something different. But we have the unanimous Pennsylvania Supreme Court telling all of us otherwise. So regardless of how we believe the issues were raised and the arguments were made, that is the law. I am going to attend to this matter, and I'll be back in just a couple of minutes.

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

(Off the record.)

(Back on the record.)

THE COURT: Sorry for the interruption. So I think I ended with indicating my analysis of the two legal issues. I just want to flush out why I don't believe that Subsection (a)(5) is covered by -- or at least to the full extent -- covered by the In Re: D.C.D. opinion.

One is (a)(5) was actually a subdivision or subsection of the termination section that was specifically mentioned by the Court In Re: D.C.D., at one to which reunification services may be relevant, and that is because of the language of (a)(5) that talks about a parent cannot or will not remedy those conditions within a reasonable period of time, and then the services or assistance reasonably available to that parent are not likely to remedy the condition, et cetera, et cetera. Obviously, if services aren't fully provided then it would be tough for them to rely on those services.

Having said that, I am not sure how much of an impediment it is to this case. You know, the construct of the concurrent goal was discussed in the appeal opinion I filed before. It has also been discussed by -- in several Supreme Court opinions

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

and Superior Court opinions, and it is a way of -- a new way of looking at cases so you don't have to walk lockstep through all the different scenarios and possible placements and possible goals.

In any event, it's constructed by the concurrent planning so that you don't have to walk lockstep through the different goals, either going forward or going backwards in the cases where it is streamlining from, let's say adoption, back to reunification, and you can do some work on both ends.

So, we have a situation where it's common -- to consider that a hybrid goal. And in this case, we have the agency that worked towards one part of the goal, the adoption part, but not the other which was the unification.

In any event, when I looked at this and applied the statutory provisions, because there had been progress made and because the agency did not work towards the concurrent part of the goal, I don't think that termination under Section (a)(5) can be supported. So I do not find that is ground for termination.

With respect to (a)(1), that is one of the sections that is subject to the pre versus post-petition filing provision. And so I am going to

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

look at that too, and if I believe that with respect to the actions and omissions and the conducts of the parents towards reunification, that the grounds were established at the time of filing with petition under Subsection (a)(1), because they certainly had for more than six months failed to perform their parental duties.

Subsection 1 doesn't talk about incapacity. It's not necessarily abandonment, but it's just that they haven't performed their duties. At that point in time Mother was in jail. Father was in jail. They both got out of jail. They spent a lot of time fighting, and that was the height of their absolutely incredible co-dependent relationship, and they certainly weren't providing the parental duties for T.W. then.

I believe the statute for the grounds were established, and because I believe the post-petition conduct, some of which was instituted afterwards, shouldn't be considered on that ground. Nothing done afterwards mattered.

With respect to (a)(2), it's typically talking about the incapacity of the parents to perform parental duties and to get back their child. Many times that's discussed when there are physical,

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

medical, substance abuse or mental health issues that preclude the parents from having the requisite capacity.

But it also talks about it in the context of being incarcerated, and in one recent case even with respect to having the long-term protection from abuse order issued against the parent.

So I don't -- I think the agency has established grounds with respect to (a)(2), but not because of the parental capacity but because as of -- for the reasons I have articulated, and the parents have not -- and they have refused to provide, by their actions, the essential parental care, control and assistance.

With respect to No. 8, that is another provision or subsection, I should say -- I'm sorry -- that is subject to the filing, or if you will, of the petition. So pretty clearly you don't have to go past the appeal opinion, and I wrote an appeal to look at the time of filing of the petition that statutory grounds were established, and for -- I should have said this -- for No. 1, of course, the time frame is six months and certainly the parents, through Subsection 1, had failed to perform parental duties for much more than six months as of filing of

*Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."*

the petition, and then even for some time afterwards.

With respect to No. 8, the period is longer; it's 12 months, and it's very clear that the parents as of that time, you know, had met the 12-month period. So if we walk through Subsection (a)(8), the agency was required to show:

1. The child had been removed from the care of the parent for at least 12 months. That's pretty much undisputed.

2. The condition that led to removal or the placement of the child still exists, and that was certainly true back then, and I believe is, in large measure, still true now. Even if I am wrong legally on the time mark -- or the filing time mark.

3. The termination of parental rights best serves the needs and welfare of the child. Under the case, as I have cited in the addendum, there are two needs and welfare analyses that needed to be conducted in this case: One is under Subsection (a)(8) and that is to see if the grounds for termination is met.

Then next is under Subsection (b), for any ground that is met, or any multiple grounds that are satisfied, whether a general termination meets the needs and welfare of the child. And so that's where

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

we are now.

With respect to Subsection 8, which is not required necessarily, and I will make this clear, separate and apart from the holding in D.C.D., Subsection 8, when it's considered as the ground for termination as opposed to Subsection (b), it does not require an analysis of the reunification efforts of either party or the agency, and that's pretty clear from the cases.

In any event, with respect to the needs and welfare analysis, here is the inescapable fact: Whether you measure it as of the time of filing of the termination petition or whether you come all the way down almost three years later to this date, or we measure it somewhere in the 24 to 30 some months time frame while the appeal was pending while the termination proceedings were ongoing, an inescapable fact is this:

While the parties -- while Mother was making apparently false accusations against Father, the parties were filing criminal and PFA filings against each other, they were exhibiting a pathological co-dependency, although it's hard to imagine, and all the other things that were in here, a foster family was raising T.W. The foster family was providing --

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

not Mom and Dad -- was providing the love, care, companionship and support that the law demands and that T.W. deserves -- not the parents -- and that is an inescapable fact.

The evidence was very clear that Time is very bonded with the foster family, and it was clear to me that severing that tie would be very detrimental to T.W. There was also an indication that there was some bonding between T.W. and both parents. However, I am going to indicate that T.W. has been in foster care in a pre-adopt home and has only supervised visits with a brief time when there were some community visits with either parent for virtually all her life.

The first few months of her life were spent in the hospital. There was a brief period after the hospital before she went into foster care that she was with both parents, and I guess at some point with Mom in a shelter, but that really -- that didn't really establish any traditional bond. The bond that is there is one that was developed with set visits and because of the biological tie.

We can't discount the fact that there is a biological tie. We can't discount the fact that T.W. knows who her parents are. But, you know, a bond

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

that's developed while the child spends the first two and a half to three years of her life in foster care, isn't quite the same thing than the bond that a parent and child create and develop with something other than biological tie and something other than supervised visits and periods of time because of incarceration or inability to get there when there were no visits, especially with respect to Mother.

So with respect to the third component of Subsection 8, I think that's pretty clearly met, and for the same reasons the needs and welfare analysis applied, the bond analysis applied with respect to Subsection (b).

In that regard, we're also supposed to look at not only is there a bond between parent and child, we have to look at what the affects of severing that bond would be. And since there is a strong bond with the foster family -- pre-adopt family -- we need to look at what the affects of severing that would be.

My assessment of everything in this case, including the facts, the evidence, my observations in court of the parents and all the documents I reviewed is that severing the bond with parents when they have some biological problems pale in comparison to at this point, and even as of the time the petition was

filed, of severing the bond between T. W. and her foster parents.

There is also a need to look at the safety of a child, and that can be considered under the needs and welfare analysis. The safety consideration typically arises in cases involving physical or sexual abuse against the child or severe neglect or abandonment of the child or improper care, especially with a child with special needs.

However, in this case safety considerations are pretty clear, and the fact that again we don't know what happened, and whether or not parents are truly separated, which I don't think they have established. Whether their volatile relationship can cause problems for T.W. and safety problems for her is something else all together, and I don't think safety has been established either.

The needs and welfare analysis is a difficult one in any case. It's a difficult one in this case. But I think the agency has met its burden, both under Subsection (a)(8) and under Subsection (b). With respect to the dependency case, the standards are not set forth in the addendum, and that's because they're recited in full in the prior opinion that I wrote.

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

With respect to the findings that I am required to make regarding permanency, placement, goals, et cetera, I am going to generally find as follows, and I will include those in the order that will be issued, and it will be as follows:

One, there is continuing and necessity for the appropriateness of the current placement. Two, the parents have shown moderate progress towards the family service plan and goals in this case. There has been some progress made towards alleviating the circumstances that necessitated the original placement.

Next, the appropriateness and feasibility of the current placement goal is proper, and obviously I'm terminating parental rights now because the goal of adoption is a correct one in my estimation. A likely date by which the goals of the child might be achieved, that depends, of course, on whether appeals are filed or not.

I think it can certainly be done in six months if they are not, and whether the child has been in placement for at least 15 of the last 22 months, and that, obviously, is yes. I will also indicate the termination petition that was filed was actually right around, maybe a little bit after the

*Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."*

15-month period, what did I say, 17 months or so.

The bottom line here is this: While I am not happy that the agency did not comply with the court order, the secondary goal, you know, we have to put that aside because all the cases cited, especially the most recent ones, talked about that we have to give these types of cases with the standard of the best interest of the child in mind; the fact that quite frankly while the appeal was going on or whatever I let the case get slipped away procedurally; the fact that the parents wanted to exercise their right to fight with the agency and stand on principles that provoked this case rather than actually move towards reunification are things we're going to have to learn from so we can move forward.

So I will issue orders terminating parental rights on three of these four grounds, not (a)(5). I will issue a dependency order that will continue the placement, continue dependency and include the findings that I summarized today on the record.

Having done all this, I want to advise both parents they have a right to appeal my decision. If you wish to file such an appeal, the appeal must be filed within 30 days of today's date. The appeal

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

must comply with a set of rules called the Pennsylvania Rules of Appellant Procedure. And because this is a case involving a dependent child, a set of -- a subset of rules called the Children's Fast Track Rules apply.

That means this case is on the fast track, which is the same set that applies when Mother filed the appeal in the dependency proceeding. If you wish to file those, you have a right. Ma'am, you have a court-appointed attorney. Mr. Leeth will be available to talk about the options and to file, if you want to do so.

Mr. Warner, you have your own attorney -- actually two attorneys. But if it comes to a point where you cannot afford those attorneys, and you qualify, the court will appoint an attorney for you to discuss this matter and for any post-hearing proceedings that may be filed. Thank you.

MS. WEEKES: Thank you, Your Honor.

(Proceedings concluded.)

Pursuant to 43 J.D.R.C.P. Rule 250c "No transcript shall be furnished to a party until all expenses of transcription are paid. Any reproduction of an official transcript without prior court approval is prohibited."

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**FORTY-THIRD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**
**JUVENILE COURT DIVISION**

In re T.W., a minor         :   **NO. 64 DP 2012**

                                  :

                                  :   **FID 45-FN-41-2012**

                                  :

                                  :   **APPEAL DOCKET 792 EDA 2014**

## OPINION IN SUPPORT OF ORDER PURSUANT TO Pa. R.A.P. 1925(a)

In this Children's Fast Track matter, D.W. ("Mother") has appealed the order entered on February 4, 2014, that continued T.W.'s dependency and changed the permanency goal from reunification, with a concurrent goal of adoption, to adoption, with a concurrent goal of reunification.[1] Mother complied with the Fast Track rules by filing her 1925(b) statement with her notice of appeal. We now issue this opinion pursuant to Pa. R.A.P. 1925(a).[2]

The relevant history, including the first contact that Monroe County Children and Youth Services (CYS) had with this family, predates T.W.'s birth.

Mother and T.W's father, E.W. ("Father"), were married in May of 2011. Their time together has, to put it mildly, been very turbulent. Their roller coaster relationship has been an on-again, off-again affair that is marked by numerous claims of domestic violence by each parent, criminal charges flying back-and-forth, multiple

---

[1] T.W.'s father did not file an appeal.

[2] Over the course of this case, four hearings have been transcribed. All four transcripts, with accompanying exhibits, are included in the certified record. For clarity and ease of reference, the transcripts will be cited as follows:

- The transcript of the July 2, 2012 Shelter Care Hearing will be cited as "N.T. 1, pp. ___"
- The transcript of the August 2, 2012 Adjudication Hearing will be cited as "N.T. 2, pp. ___"
- The transcript of the December 20, 2013 Review Hearing will be cited as "N.T. 3, pp. ___"
- The transcript of the second day of the review hearing, convened on January 24, 2014, will be cited as "N.T., 4 pp. ___"

1



filings under the Protection From Abuse ("PFA") Act, outright lies told by Mother about Father, instability, periods of separation, and, significantly, a rare level of pathological co-dependence that has continually brought Mother and Father back together despite the volatility of their union. Acts of violence occur when Mother and Father are together and when they are separated. (N.T. 2, pp. 9-14; N.T. 3, pp. 11, 14-18, 21-27, 52-56, 65-67, and Exhibits 2 through 4; N.T. 4, pp. 23-24, 30-31, 45-46, 84-88, 110-122, and GAL Exhibits 1 through 5).

Mother and Father both have children other than T.W. In fact, both have children from prior relationships that were also marked by domestic violence.

Including T.W., Mother has four children with four different fathers. Her relationships with the fathers of her three other children involved abuse, violence, and multiple PFA orders, some of which were issued against Mother. (N.T. 2, pp. 13-14; N.T. 3, pp.15-16 and Exhibit 4; N.T. 4, pp. 141-150). In part because of this history, Mother does not have custody of any of her minor children. Mother's oldest son, who is an adult, lives with Mother in Monroe County. However, her eight year-old son lives with his father in Georgia, a state that Mother cannot visit due to an outstanding arrest warrant. Mother has not seen her younger son in person since December of 2010. Similarly, Mother has a five year-old daughter who lives with her father in Florida. Mother last saw her daughter in April of 2011 when the police removed the child from Mother so that the child could be returned to her father. (N.T. 2, pp. 13-14; N.T. 4, pp. 146-150). Finally, as discussed below, T.W. has been in care in Monroe County since July 1, 2012.

2

Father has at least sixteen children with several different mothers. His children range in age from a son who is twenty-two down to T.W., who is now two years old. (N.T. 2, pp. 13-14; N.T. 3, p. 111; N.T. 4, pp. 122-127). Domestic problems in Father's past relationships started almost twenty-five years ago when the mother of his oldest child obtained a PFA against him. (N.T. 4, p. 127). The continuation of domestic problems led to the initial contact between CYS and Father.

In October of 2011, after Mother and Father were married but before T.W. was born, the mother of nine of Father's children filed in this Court a petition, on behalf of herself and all nine children, seeking a PFA against Father. CYS was ordered to assess the safety of the children. Following a hearing, the petition was granted and an eighteen-month PFA was issued against Father. The children and their mother were all named as protected persons. After the PFA was issued, the children and their mother moved to New Jersey. (N.T. 2, pp. 5-10; N.T. 4, pp. 122-127).

Subsequently, Mother became pregnant with T.W. Nonetheless, the domestic violence between Mother and Father continued. They tried some forms of counseling, but subsequent history has demonstrated that the counseling was not successful.

T.W. was born in 2012. She was very premature and had to stay in the hospital for a long time after birth. As a result, T.W. has a heart condition that needs to be monitored. Although both parents were aware of the condition, neither mentioned it to caseworkers when T.W. came into care. CYS later found out about the condition from one of T.W.'s doctors. (N.T. 2, pp. 9-15; N.T. 3, pp. 132-133).

T.W. first came to the attention of CYS on June 30, 2012. On that date, the agency received a referral that T.W. had been injured when Father threw her in her

3

car seat out of the family's van during a roadside argument with Mother. T.W. was initially taken to Pocono Medical Center, a local hospital, where she was diagnosed with a concussion and tests showed that she had hairline fractures. As a result, T.W. was transported to the pediatric trauma unit at Lehigh Valley Hospital, a regional medical facility located in Allentown, Pennsylvania. (N.T. 1, pp. 5, and 13-14; N.T. 2, pp. 9-18, Ex. 7, 8, and 9; N.T. 3, pp.39-48, Mother's Exhibits 1 and 2, and GAL Exhibit 1; Dependency Petition, filed July 9, 2012).

T.W. spent one night in Lehigh Valley Hospital. While T.W. had observable injuries, she was luckily not as seriously injured as originally thought. She was described as having a contusion on the left side of her head, a history of prematurity, and having suffered a fall, a head injury, and post concussive syndrome. She was released the next day. (N.T. 2, pp. 9-18, Exhibits 7, 8, and 9; N.T. 3, pp. 39-48, Mother's Exhibits 1 and 2, and GAL Exhibit 1).

CYS caseworkers interviewed Mother at Lehigh Valley Hospital about the incident. Regarding T.W.'s injuries, Mother told the caseworkers that the incident occurred while Father was driving her to a new job. During the trip, a bad argument erupted. Father became enraged, called Mother horrible names, hit and slapped her, and pulled her hair. At one point, Father pulled over. When Mother tried to take T.W. out of the car to keep her safe, a tug-of-war over the baby ensued. In a fit of rage, father grabbed the seat and threw it to the ground with tremendous force. Father started to leave, but then came back and broke Mother's cell phone. He then drove away, leaving Mother and T.W. at the side of the road (N.T. 2, pp. 9-20; Dependency Petition, filed July 9, 2012. *See* N.T. 3, pp. 39-48). The statement Mother gave the

4

caseworkers was consistent with the statements she gave to the Pennsylvania State Police and medical personnel. (N.T. 3, pp. 100-102). In all initial statements, Mother unequivocally stated that Father threw T.W. in her car seat out of the vehicle.

The caseworkers also obtained from Mother a history of her relationship with Father. Mother told the caseworkers that Father is verbally and physically abusive, very controlling, and vulgar. She stated that Father had assaulted her on several occasions and showed the caseworkers scars and burns up and down her arms that she said were inflicted by Father. The caseworkers took photos of the burns and scarring that were later admitted into evidence during the adjudication hearing. Mother also told the caseworkers that Father had raped her and had "put out a hit on" the woman who was the mother of nine of his children and who had obtained PFA against him. (N.T. 2, pp. 9-20; Dependency Petition, filed July 9, 2012. *See* N.T. 3, pp. 39-48).

Based on Mother's statements and T.W.'s injuries, the caseworkers developed a safety contract. The plan included Mother filing for a PFA against Father, having no contact with Father, and taking T.W. to a shelter where Mother had previously sought refuge from Father. Mother agreed to the contract. (N.T. 2, pp. 18-19).

The caseworkers explained to Mother that, given the circumstances, CYS would be opening a case, investigating the matter, and providing necessary services. Mother was told the investigation would include running criminal history checks. Mother was then asked whether she had any criminal history. Mother denied having any history. (N.T. 2, p. 20).

5

As a result of the incident, Father was charged with Aggravated Assault and related charges. He was incarcerated in the Monroe County Correctional Facility in lieu of bail.

CYS caseworkers ran Mother's criminal history. They discovered that Mother had not been honest with them, in that she had a substantial arrest record, including a charge of cruelty to children, although dispositions for some of the arrests were not reported. Significantly, the history also revealed that there was an outstanding warrant out of Georgia for Mother's arrest on forgery charges which was lodged with the notation that Georgia would extradite. (N.T. 1, pp. 2, 5, and 10; N.T. 2, pp. 20-25; N.T. 3, pp. 46-48). Later, CYS learned that Mother had used several names and aliases in several states and that she had or may have additional criminal history in other states. (N.T. 1, p. 7; N.T. 2, pp. 20-24).

Mother was arrested on the warrant on July 1, 2012. That same day, CYS sought and was granted emergency protective custody of T.W. since both of her parents were incarcerated and no suitable relatives were immediately available. T.W. has been in care ever since.

Over the next few weeks, several hearings were held. In addition, Mother's story and position began to change. In broad summary:

A shelter care hearing was held on July 2, 2012. The hearing was convened quickly in order to give Mother the opportunity to place her position on the record and advise the Court, CYS, and the guardian *ad litem* of possible family or other placement resources for T.W. before she faced extradition to Georgia. In fact, Mother was allowed to participate in the hearing by telephone from jail so that she

6

could assert her position. (N.T. 1, pp. 2-8 and 15-19). Mother provided the names of several family members, including her 21 year-old son with whom she lived, as family resources. (*Id.* at 10-13). Surprisingly, Mother then began the process of recanting her story and accusations against Father. She said that the charges (which were based on statements she made to authorities) were false and inaccurate, that she would not testify against Father, that she did not believe that father had injured T.W., that the doctors at Lehigh Valley indicated that Pocono Medical Center had misdiagnosed T.W., and that T.W. did not have any injuries. (*Id.* at 8-11, 13, and 15). Mother also stated that, if she was extradited to Georgia and Father was released from prison, she wanted T.W. to be with Father. (*Id.* at 13 and 15).

Around the same time, a separate extradition hearing was held. In advance of the hearing, the Commonwealth filed a motion to detain Mother here as a material witness in the case against Father. At hearing, the Assistant District Attorney assigned to the case represented that he had personally communicated with officials from Georgia who, despite the extradition notation in the data base, declined to extradite Mother. Thus, both extradition and the Commonwealth's motion became moot.

At one point while both parents were in jail, Mother attempted to use deception to arrange an in-jail meeting with Father. Specifically, she falsely told officials at the jail that the undersigned had given her permission to meet with Father in the correctional facility to discuss their cases and T.W. Of course, no such permission had been given. The in-jail meeting was foiled when the correctional facility called

7

CYS and was told that the Court had not given any such permission. (N.T. 2, pp. 61-63).

Prior to the adjudication hearing, Father gave his first version of what had happened on June 30, 2012. He indicated that it was Mother who violently pulled T.W. in her car seat from the car. (N.T. 2, pp. 44-47, and 53).

In addition, Mother was arrested and criminally charged for the incident and injuries sustained by T.W. As a result, as of the time of the adjudication hearing, both parents stood charged with committing crimes against T.W.

An adjudication hearing was held on August 2, 2012.[3] At the hearing, several witnesses testified and medical records from Pocono Medical Center and Lehigh Valley Hospital were admitted into evidence. It was established that T.W. had been injured, but not as seriously as originally thought. (N.T. 2, pp. 18-20, 28-30, and Exhibits 3, 7, 8, and 9). At the conclusion of the hearing, T.W. was adjudicated dependent and her placement in foster care was continued. The initial permanency goal was reunification. Neither parent appealed the dependency adjudication.

Based on her age, T.W. qualified for this Court's three-month review protocol. Accordingly, three-month permanency and placement review hearings were held before the dependency Master throughout the remainder of 2012 and into 2013. The last hearing before the Master was held in May of 2013. Throughout the proceedings before the Master, the permanency goal approved by this Court was reunification, with a concurrent goal of adoption. (*See* Orders dated October 25, 2012, January 10,

---

[3] The adjudication hearing was initially scheduled for mid-July 2012, but was continued and then rescheduled to August 2, 2012, because of the subsequent charges that were filed against Mother, the preliminary and other hearings that were being held in the criminal cases, and a series of unfortunate conflicts that arose regarding attorney representation for the parents. These intervening events account for the delay between the shelter care hearing and the adjudication hearing.

8

2013, and May 10, 2013). No party objected to any of the Master's recommendations.

This case was scheduled for another review hearing before the Master in September of 2013. At the hearing, the parties appeared. CYS objected to the jurisdiction of the Master. Even though no hearing was held that day, the appearance was significant in that Mother showed up with injuries that she said were inflicted by Father in an incident for which Father was criminally charged. The charges were later dropped because Mother refused to cooperate. (N.T. 3, pp. 21-22).

As a result of the objection lodged by CYS, a hearing before the Court was scheduled in October 2013. However, the guardian *ad litem* asked for a continuance so that she could obtain records regarding Mother from both Florida and Georgia. The continuance was granted.

A review hearing was convened before the Court. Evidence was taken on December 20, 2013, and January 24, 2014. At the conclusion of the review hearing, the Court issued the goal change order from which Mother has filed this appeal.[4]

The two-day review hearing generated a substantial amount of evidence. Due, in part, to changes in counsel for both parents over the course of this case, a significant portion of the two-day hearing repeated evidence, much of which is summarized above, that was introduced in prior proceedings. In addition, new

---

[4] On December 3, 2013, CYS filed a petition for termination of the parental rights of both parents. We recognize that, in an appropriate case, it is a "best practice" to hold goal change and termination of parental rights hearings simultaneously. In this case, we did not adopt this procedure because the petition for a review hearing was filed and the review hearing was originally scheduled within the relevant fifteen month period, the rescheduling before the court and attendant continuance were requested by CYS and the guardian *ad litem*, not parents, the termination petition was not filed until after the review hearing had been scheduled, and, significantly, review orders and record facts demonstrated that parents had made moderate progress. In the order that Mother is challenging in this appeal, we scheduled a hearing on the termination petition. However, at the request of the parties, that hearing has been continued until this appeal is decided.

9

evidence was presented, and matters that had been previously recited were expanded upon and clarified.

At the review hearing, Father provided his version of what happened on June 30, 2012. The first portion of Father's story is consistent with the statements Mother made at the time. Like Mother, Father indicated that the incident occurred when a very bad argument erupted while Father was driving Mother to work and a tug-of-war over T.W.'s car seat occurred after Father had pulled over to the side of the road. In all other respects, the parents' respective versions of events were diametrically opposed. (N.T. 4, pp. 91-101).

Father denied that he hit or verbally or physically abused Mother. In addition, Father stated that Mother was the instigator. He adamantly denied throwing T.W. in car seat from the vehicle. Instead, he testified that he tried to block Mother from removing T.W. from the van, but that Mother, in the tug-of-war, was violently pulling at the car seat and ultimately violently pulled the seat out of the van. Thereafter, Mother held the car seat behind her while threating various types of action against Father. This version of events is consistent with what Father had previously told CYS workers. (N.T. 2, pp. 42-43, and 46-48; N.T. 3, pp. 3 and 48; N.T. 4, pp. 91-101).

Father's rendition of what happened during the June 30, 2012 incident was not the only evidence presented during the review hearing of Mother's inappropriate physical handling of T.W. and was not the only explanation for T.W.'s injuries that he advanced. Additionally, Father showed a CYS supervisor text messages in which Mother informed Father that she had dropped T.W. two days before the June 30, 2012 incident and admitted to making up the allegations against Father. (N.T. 3, pp.

10

59-62; N.T. 4, pp. 42-49). CYS found the timing of Father's disclosure to be problematic, because the disclosure was made months after T.W. was adjudicated dependent and long after the dropping incident should have been reported to medical personnel. (N.T. 3, pp. 59-62; N.T. 4, pp. 25-26, 37, 42, and 49).

Along similar lines, Father's two versions about how T.W. was or could have been injured was inconsistent with both parents' early contention, which Mother resurrected during the review hearing, that T.W. had not been injured. (N.T. 3, pp. 59-62).

Between the time T.W. came into care and commencement of the December 2013 review hearing, significant events transpired in the parents' criminal cases. First, Mother fully and formally recanted her story. She said that Father did not throw T.W. out of the van. As a result, and because the injuries to T.W. were more ambiguous than initially thought, the Commonwealth ultimately withdrew the charges against Father. Mother, in turn, pled guilty to an amended charge of false reports to law enforcement based on her lying to the police about Father. She was placed on probation. (N.T. 3, pp. 39-48 and 95-104).

Evidence presented during the review hearing demonstrated that Mother and Father's continuing course of abusive and violent conduct against each other, of which the June 30, 2012 indent was a part, has not abated. Specifically, even after Mother and Father were told they needed to stop the pattern of abuse and violence before T.W. could safely be returned to either or both of them, there were additional incidents in which one parent assaulted or allegedly assaulted the other. In several of the incidents, police responded and the parent who committed the assault was

11

charged. In one incident, caught on videotape, Father assaulted Mother outside a community library. In another incident, Mother cut Father with a knife. In still another, mentioned above, Father assaulted Mother, who soon thereafter appeared for a Master's hearing with a split lip.

The evidence also demonstrated that the parallel pattern of neither parent following through on charges also continued: in each case in which an arrest was made, charges were dropped because the victim spouse declined to cooperate or appear for hearings. Similarly, the pattern of Mother and Father getting back together after bouts of violence continued. After each incident, the parties reconciled, although most recently they have played their reconciliation close to the vest. (N.T. 3, pp. 11, 14-18, 58-62, and 65-75; N.T. 4, pp. 23-31 and 45-46).

PFA filings also continued. Father filed multiple PFA petitions against Mother, the first three or four of which were dismissed because Father failed to appear. In a final round of PFA filings, Father filed against Mother, Father's adult daughter, who had purportedly come to live with him, also filed against Mother, and Mother filed a against Father. All three petitions were dismissed after a hearing. (N.T., 3 pp. 14-18, 58-62, and Exhibit 4; N.T. 4, pp. 23-31, 110-122, and GAL Exhibits 1-5).

At the review hearing, Mother testified that she and Father are, finally, estranged. She stated that they have not been together since September of 2013 when Father gave her the split lip. (N.T. 4, pp. 139-140). However, based on the history of this case, Mother's past deceptions, the evidence presented by CYS, the conduct of both parents, and our in-court observations of Mother and Father, we did not find Mother's statement credible. In this regard, as indicated, the violence and

12

domestic abuse has continued. The incident in which Mother cut Father with a knife occurred at Father's residence. Despite the fact that the parties were supposedly living apart and Father had asked for separate visits so he and Mother would not come into contact with each other, Father has been seen driving Mother to and dropping her off for visits and criminal hearings. Most recently, when CYS personnel have attempted to ask about the current status of the parents' relationship, Father has told them that it is none of the agency's business. (N.T. 3, pp. 11, 56-59, and 65-75: N.T. 4, pp. 23-31, 71, and 84-88, 110-122).

While both parents demonstrated an inability to cease their violent and co-dependent behaviors, each has made some progress. Specifically, both parents completed their plan goals for counseling, parenting classes, anger management classes, and related goals. In fact, Mother has exceeded the counseling and education requirements, albeit with some prompting based on her criminal case and probationary sentence. (N.T. 3, pp. 12, 49, and 52; N.T. 4, pp. 48 and 135-139). At the same time, the evidence demonstrated that counseling and classes have not been enough to help Mother either fix her unhealthy relationship with Father or separate from him, and have similarly been insufficient to prompt Mother to stop her own violent and abusive behaviors.

In addition, Mother has indicated that she is continuing her education, seeking to become a nurse, and that she now works at JC Penny, both of which, if Mother is following through, are positive. However, Mother has not responded to the requests of CYS for documentation of her employment. (N.T. 3, pp. 11-12; N.T. 4, p. 140).

13

Further, both parents have visited on a regular or fairly regular basis, Mother more so than Father. In fact, at one point, based on their completion of several plan goals, Mother and Father progressed to having community visits. However, as noted, there have some problems that resulted in Father asking for the visits to be returned to the Agency. In addition, Father protested the participation of Mother's family in visits, especially community visits. Further, the continued violence between the parents, despite their completion of counseling and therapy, raised legitimate safety concerns. As a result, visits were moved back to the CYS facility. (N.T. 3, pp. 12-15, 34-35, 49, and 52-60; N.T. 4, pp. 23-31, 48, 135, and 141-143).

Mother is currently living with her mother and her adult son in a three-bedroom home in Stroudsburg. If she regains custody of T.W., Mother's plan would be to bring T.W. into the home. However, the home is in a high crime and drug trafficking area. In fact, Mother's adult son, whom she had at the outset of this case identified as a resource for T.W., was arrested for possession of drugs with the intent to deliver after selling drugs to a confidential informant in the home. (N.T. 3, pp. 11-12; N.T. 4, pp. 72-75, 132-133, 140, and 146-147).

Finally, consistent with their inconsistent, dysfunctional, co-dependent relationship, each party, in his or her own way, advised the Court that they do not believe that T.W. would be safe with the other parent. They did so despite the fact that the circumstances that prompted each parent's safety concerns were known to Mother and Father at the time of their past reconciliations and regardless of the fact that they are now together again.

14

The totality of these facts and circumstances prompted us to issue the order from which Mother has filed this appeal.

The applicable standard of review is well-established. As recently reiterated by our Supreme Court:

> [A]ppellate courts must apply an abuse of discretion standard.... [I]n dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa.2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; [ *In re* ] *R.I.S.*, [614 Pa. 275] 36 A.3d [567,] 572 [(Pa.2011) (plurality) ]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel–Bassett v. Kia Motors America, Inc.* [613 Pa. 371], 34 A.3d 1, 51 ( [Pa.]2011); *Christianson v. Ely*, 575 Pa. 647, 838 A.2d 630, 634 (2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of

15

discretion. *In re Adoption of Atencio*, 539 Pa. 161, 165, 650 A.2d 1064, 1066 (Pa.1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826–827 (2012). *See also In re R.J.T.*, 9 A.3d 1179 (Pa. 2010); *In re K.J.*, 27 A.3d 236 (Pa. Super. 2011); *In re M.B.*, 19 A.3d 1084 (Pa. Super. 2011).

The law that we applied in making factual findings and issuing the goal change order from which Mother has appealed is equally well-settled. Once dependency is found, the standard to be applied is the best interests of the child. This standard applies to, among other considerations, disposition, placement, and custody of dependent children, and the establishment of goals and goal changes for families. On these issues, determinations turn on what is in the child's best interests, not on what the parent wants or which goals the parent has achieved. *See R.J.T., supra; In re K.J., supra; In re K.C.*, 903 A.2d 12 (Pa. Super. 2006); *In re B.S.*, 861 A.2d 974 (Pa. Super. 2004). Thus, in a goal change proceeding, a parent's progress toward alleviating the circumstances that caused placement is but one factor that must be considered. *In re B.S., supra*. In fact, when the best interests of the child so dictate, dependency and placement outside the home may be continued, even if the parent has met all goals established in the Family Service plan. *See In re K.C., supra*.

Additionally, as our Superior Court recently stated:

> Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act [42 Pa.C.S. §§ 6301–65], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and

16

long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

*In re N.C.*, 909 A.2d 818, 823 (Pa.Super.2006) (citations omitted) (footnotes omitted).

Pursuant to § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. *In re R.J.T.*, 9 A.3d at 1186–1187 n. 8 (" *In re R.J.T. II* "). The best interests of the child, and not the interests of the parent, must guide the trial court. *In re S.B.*, 208 Pa.Super. 21, 943 A.2d 973, 978 (2008). As this Court has held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re N.C.*, 909 A.2d at 824 (quoting *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa.Super.2003)).

*In re M.B.*, 19 A.3d at 1088-89.

In setting or changing goals and making statutorily required findings, juvenile courts are not required to select only one goal at a time. Rather, as we have done throughout the course of this case, courts may establish concurrent goals and direct that child welfare agencies engage in concurrent planning, which in its most frequently used form, "involves a dual-track system by which agencies are

17

encouraged to provide simultaneous services aimed at both reunification and adoption." *In re S.E.G.*, 901 A.2d 1017, 1019 (Pa. 2006). *See also R.J.T., supra.* Indeed, concurrent planning has been identified as a "best practice." *R.J.T., 9 A. 3d at 1191 n. 14.* This is "because it both protects the child from foster care drift, by allowing agencies to consider adoptive resources ... while at the same time keeping alive the potential for reunification." *In re S.E.G.*, 901 A.2d at 1029. *See also R.J.T.*

Prompted by Mother's appeal, we have again reviewed this case in light of the law summarized above. We remain firmly convinced that we neither erred nor abused our discretion in issuing the goal change order. More importantly, we believe the goal change order is consistent with the best interests of T.W.

In her appeal statement, Mother lists seven assignments of error which, for the most part, are subsumed in her first assignment in which she contends that "[t]he trial court erred inasmuch as the evidence presented at the Permanency Review Hearing was insufficient to support changing the goal to adoption instead of reunification". (Mother's 1925(b) Statement, Paragraph 2). The remaining assignments of error take issue with specified findings and determinations. Mother claims that the identified findings were individually erroneous and cumulatively led us to improperly change the permanency goal. There is no merit to any aspect of Mother's arguments.

The reasons why we changed the goal to adoption, with a concurrent goal of reunification, are presaged by and captured in our recitation of the facts of this case. In a nutshell, T.W., while still a premature and fragile infant, was dropped, injured, and, by both parents' account of the June 30, 2012 incident, the subject of a roadside tug-of-war between Mother and Father. The underlying problem that caused T.W. to

18

be put in peril and injured is the well-documented, deep-seated history of violence between Mother and Father that is embedded in their relationship and presents a danger to others, especially T.W. Despite anger management classes, parenting classes, services from CYS, counseling received from a clinician, a minister, and a pregnancy crisis group of her own choosing, as well as involvement in the criminal justice system and PFA court, Mother has to date been unable to extricate herself from her relationship with Father, protect herself from Father, restrain her own violent and abusive tendencies, stop the alternating pattern of being a victim and then a perpetrator of abuse, or stop her pathological lying. In fact, based on the evidence, Mother and Father's history, and the courtroom demeanor of both parents, we firmly believe that the parties are together and not, as Mother testified, estranged. Simply put, Mother has not demonstrated necessary protective capacities and the reasons that caused T.W. to come into care have not, despite Mothers protestations to the contrary, been alleviated. Unless Mother makes drastic changes very soon, the reasons will not be alleviated.

In addition, Mother articulated a home plan that would have T.W. living in a home, located in a high crime drug-trafficking area, out of which her maternal uncle was caught selling drugs and now stands charged with felony drug crimes. Obviously, that plan is not suitable.

Further, while Mother's satisfaction of many plan goals is a positive, she has not been able to put what she has learned into action in order to make the necessary changes to properly parent T.W. and ensure her child's safety. Along similar lines, Mother has indicated that she has a job and is going to school. However, she has

not yet provided formal proof or documentation of her employment or the specifics of the nursing program in which she has indicated she is enrolled.

Finally, as of the original date scheduled for the review hearing before the Master, T.W. had been in care approximately fourteen months. She has now been in care for more than the 18 months in which our appellate courts have indicated that, under current law, permanency should be achieved. *See In re R.J.S.*, 901 A.2d 502 (Pa. Super. 2006); *In re N.W.*, 859 A.2d 501 (Pa. Super. 2004). *See also In re K.M.*, 53 A.3d 781 (Pa. Super. 2012). During this time period, Mother was not able to learn from her mistakes, capitalize on the counseling and services which she had received, demonstrate the necessary protective capacities, alleviate the reasons for T.W.'s removal from the home, or show that she has the ability to parent T.W. in a manner consistent with T.W.'s best interests.

Under the settled law summarized above, the applicable standard is the best interests of the child. Under equally well-established law, T.W.'s safety, permanency, and wellbeing are paramount, and these considerations trump either parents' needs, desires, and beliefs. Based on our longitudinal view of the evidence, our in-court observations of Mother on and off the witness stand, Mother's overall parenting history, the facts presented by CYS, the well-reasoned and articulated positions of CYS and T.W.'s guardian *ad litem*, and the applicable law, it was and still is obvious to us that Mother has simply not progressed to the point where T.W. could safely be returned to her. That determination, coupled with T.W.'s needs and welfare, the amount of time T.W. has been in care, and the firmly entrenched and oft-quoted doctrine that "a child's life simply cannot be put on hold in the hope that the parent

20

will summon the ability to handle the responsibilities of parenting," *In re M.B.*, 19 A.3d at 1088-89 (citations omitted), led us inexorably to the conclusion that the goal change we ordered was in T.W.'s best interests.

At the same time, the goal change with which Mother takes issue has not, as she apparently fears, completely cut off all hope or the possibility of reunification. Nothing in our order precludes Mother from redoubling her efforts or prevents either the provision of reunification services or the possibility of reunification itself. In fact, the order includes a concurrent goal of reunification. We included that concurrent goal because some progress had been made in that both parents had satisfied the plan goals mentioned above. As a result, and considering all facts and circumstances, while termination and adoption planning must now take lead position in this case, we did not at the time believe it necessary to completely cut off all possibility of reunification. If Mother is truly sincere about her desire to turn things around, be truthful, and work toward demonstrating that she can provide for the health, safety, welfare, needs, and best interests of T.W., she still has the ability to do so.

Mother's individual assignments of error may be discussed and disposed of quickly. Mother's first contention is that this Court did not give proper weight to the fact that she had "completed a Child Permanency Plan and would be capable of completing any additional plan for the return of the minor child." (Mother's 1925(b) Statement, Paragraph 3). This assertion is not supported by the record.

We did, in fact, give credit and proper weight to the fact that Mother had completed, and in some instances exceeded, the plan goals mentioned above.

21

Indeed, it is for this reason that we made a finding in the order Mother has appealed, as well as in prior review orders, that Mother has made moderate progress. At the same time, viewing all facts and circumstances in light of the best interest standard, the progress made by Mother was not enough. T.W.'s safety and Mother removing herself and T.W. from the vortex of violence that marks Mother's relationship with Father have throughout this case been overarching goals and considerations. Despite receiving many services, Mother has simply not met this goal. Since Mother has not developed or demonstrated necessary protective capacities to keep T.W. safe, because the Court has found that Mother and father have not been forthcoming about the current status of their relationship, and given the fact that Mother does not have a suitable home plan, it is clearly not in T.W's best interests at this point in the proceeding to work toward reunification as a primary goal. Again, in a goal change proceeding, a parent's progress toward alleviating the circumstances that caused placement is but one factor that must be considered. *In re B.S., supra.* In fact, when the best interests of the child so dictate, dependency and placement outside the home may be continued, even if the parent has met all goals established in the Family Service plan. *See In re K.C., supra.*

Mother's second assignment of error is that we failed to give proper weight "to the medical testimony alleviating the circumstances which necessitated the original placement; testimony from the treating physician indicated that the occipital hairline fracture which necessitated the original placement was indicative of premature delivery and eliminated physical abuse or blunt force trauma." (Mother's 1925(b) Statement, Paragraph 4). Simply, we did not so err.

22

Throughout this case, we have considered the medical testimony that has been presented. That evidence is summarized above. Our finding, based on that evidence, is that T.W. was, in fact, injured, although the injuries were luckily not as serious as first believed when a diagnostic test performed at Pocono Medical Center revealed the hairline fractures. Mother's disagreement with our finding does not allege, much less demonstrate, an error of law or an abuse of discretion. This is especially true since our finding is supported by both the documentary medical evidence that was submitted at the adjudication hearing and the most recent review hearing[5] and the testimonial evidence that parents elicited from the Lehigh Valley Hospital physician whom Father called as a witness.

In this regard, the Lehigh Valley Hospital physician expressed his opinion that the hairline fractures first seen at Pocono Medical Center were older injuries, not acute injuries. However, he did not render an opinion, to a reasonable degree of medical certainty or otherwise, that "eliminated physical abuse or blunt force trauma." Rather, the doctor opined that the hairline fractures resulted from a previous trauma, which another doctor speculated might have been a birth-related trauma, although neither doctor knew anything about the birth itself or whether T.W. was delivered normally or by C-Section. Similarly, no medical professional at the time had a history that included Father's version of events that transpired on June 30, 2012 or the fact that Mother had dropped T.W. two days before. When the doctor's testimony is viewed objectively, in full, and in conjunction with the medical records, it is clear that

---

[5] Counsel for Father, and to some extent the attorney for Mother, spent a substantial amount of time at the review hearing asserting that the records from Lehigh Valley Hospital had not been previously admitted into evidence, and asserting, or at least implying, that the records had been withheld by CYS, the Commonwealth, or both. However, the record is clear that medical records from both Pocono Medical Center and Lehigh Valley hospital were admitted during the adjudication hearing. (N.T. 2, pp. 2 and 31 and Exhibits 7, 8, and 9).

23

T.W. in fact had hairline fractures that resulted from some sort of trauma, but were not, in the doctor's opinion, acute injuries. In addition, the doctor acknowledged that there were objective signs of injury in the nature of a contusion on the left side of T.W.'s head. Further, he ultimately did not dispute Pocono Medical Center's diagnosis of a concussion. In fact, Lehigh Valley Hospital discharged T.W. with a diagnosis of head injury and indicated that she had suffered a fall, a head injury, and post-concussive syndrome. (N.T. 3, pp. 77-83, Mother's Exhibits 1 and 2, and GAL Exhibit 1).

Moreover, this argument is nothing but a reiteration of the assertion Mother has made at various points in this case that T.W. did not sustain *any* injuries. Even if that interpretation is accepted as true, it misses the point of the case – and the objective facts. T.W.'s injuries brought T.W. to the attention of CYS and ultimately to this Court. Mother and Father's incarceration, coupled with Mother's past, caused T.W. to come into care. Since then, it has been the need to keep T.W. safe and parents' inability to ensure that need, not the fact that she was previously injured, that has kept her in care. T.W.'s injuries have healed and the holes in her heart that both parents failed to mention have mended. However, concern for T.W.' safety and over Mother's lack of protective capacities remain.

Due to Mother's admitted lying about the June 30, 2012 incident, her history of deception, the fact that Mother and Father are both playing their cards close to the vest, and the discrepancies between the statements of both parents and their conduct, we may never know exactly what occurred on June 30, 2012, or precisely what happened to T.W. when Mother dropped her several days before. What we do

24

know is that on June 30, 2012, and on at least one prior occasion, T.W. was placed in harm's way by one or both parents because of the volatile nature of their relationship. Since her parents are still acting abusively towards each other, the circumstances which caused T.W. to be put in peril continue to exist. Similarly, neither parent has to date been able to demonstrate acceptable protective capacities. Simply, T.W.'s safety is not ensured. Thus, it is at present largely irrelevant how the medical evidence in this case is interpreted or how T.W's 2012 injuries are characterized.

T.W.'s health, safety, and well-being are the paramount concerns, and her best interest is the guide star. T.W.'s safety must be ensured regardless of whether she was injured in the roadside incident, which scenario could be supported by at least Father's testimony; in the incident where Mother dropped her, which scenario could be supported by the statements of both parents; or in some prior incident which has yet to be explained by parents, but that would be equally problematic. In fact, T.W.'s safety must be assured even if Mother's no-injury assertion is accepted. Neither parent has demonstrated the current ability to provide the requisite assurance. In this regard, it cannot be emphasized enough that, under both parents' versions of the June 30, 2012 incident, T.W. came into care because the volatile nature of Mother and Father's relationship shockingly caused them to became embroiled in an argument that led them to literally play a game of tug-of-war with T.W., in her car seat, at the side of a public road. While T.W. is now physically safe, the tug-of-war between the parents continues, at times literally and at times

25

figuratively, and the underlying issues that cause their battles have not been resolved.

Assignments of error four through six take issue with specific findings we made regarding the reasonableness of efforts made by CYS to finalize T.W's permanency plan. (Mother's 1925(b) Statement, Paragraphs 5, 6, and 7). All three assignments are bootless.

Mother first implies that efforts were unreasonable because "more than three months expired without a review of the permanency plan." However, three month reviews are not mandatory. The Juvenile Act and the applicable rules of Juvenile Court Procedure require that courts conduct permanency and placement reviews at least every six months. *See* 42 Pa.C.S.A. § 6351(e)(3) and Pa. R.J.C.P. 1607B. While three month reviews are a best practice that this Court has generally adopted for a targeted number of dependency proceedings pursuant to a local protocol, there is simply no legal requirement to conduct ninety day reviews.

We recognize that almost seven months elapsed between the most recent review before the Master and the review hearing that was convened by this Court in December of 2013. However, the extra month was not caused by any improper or unreasonable act on the part of CYS or any omission by the Court. CYS exercised its right to object to the jurisdiction of the Master. That action resulted in the scheduling of a hearing before the court within the required six month period. The hearing was continued slightly outside that period based on a reasonable request for a continuance made by the guardian *ad litem* that was granted by the Court. Further, after the hearing began, Mother (and Father) was given two hearing days of

26

opportunity to question witnesses and present evidence. Finally, Mother has not alleged any prejudice and none is shown in the record. Under these facts, and considering the overall circumstances of this case, we discern no unreasonable act or omission on the part of CYS and no error or abuse of discretion on the part of this Court.

Mother next asserts that CYS did not make reasonable efforts because the agency did not asses her home. However, for the reasons discussed above, we do not consider Mother's current home and home plan to be suitable for T.W. In addition, Mother has not progressed to the point where she has demonstrated the necessary protective capacities for T.W. to be returned to her. In addition, her volatile relationship with Father continues. As a result, and given the other circumstances of this case, we see no error on the part of CYS in declining to assess Mother's home at this time.

Mother's final reasonable efforts challenge is that CYS unreasonably switched Mother's visits back from community visits to visits at the agency. However, given the facts and circumstances discussed above, especially the safety issues that remain, we believe that CYS acted reasonably in moving visits back to the agency at the time the change was made.

In her final assignment of error, Mother almost unbelievably contends that "[t]he trial court erred by relying upon allegations of domestic violence between Mother and Father. " (Mother's 1925(b) Statement, Paragraph 8). This assignment of error merits no response beyond the following statement: Given the facts and circumstances of this case, we obviously did not err in considering the history of

27

domestic violence between Mother and Father. Quite to the contrary, it would have been beyond a gross abuse of our discretion to have ignored the history.

For these reasons, we believe that our goal change order effectuated the health, safety, needs, welfare, and best interests of T.W. and should be affirmed.

Date: 4/11/14

_____
Jonathan Mark, J.

Cc: Superior Court of Pennsylvania
Jonathan Mark, Judge
Donald M. Leeth, Esq.
Eric L. Hamill, Esq.
Elizabeth B. Weekes, Esq.
Lori J. Cerato, Esq.
Brett J. Riegel, Esq.

2014 APR 11 PM 1 15
MONROE COUNTY, PA
CLERK OF COURTS

28

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA
JUVENILE COURT DIVISION

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | NO. 64 DP 2012 |
| | : | 48 OCA 2013 |
| T. W. , a minor | : | |
| | : | |

## ADDENDUM TO ANNOUNCEMENT HEARING

The law I applied to the facts of this case these cases in reaching the decisions I am announcing today is well settled. In comprehensive summary:

1. Termination of Parental Rights

In termination cases, the burden is upon the petitioner, in this case Monroe County Children and Youth Services ("CYS"), to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. *In re T.D.*, 949 A.2d 910 (Pa. Super. 2008); *In re S.H.*, 879 A.2d 802, 806 (Pa. Super. 2005). Clear and convincing evidence has been defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *In re K.Z.S.*, 946 A.2d 753, 757 (Pa. Super. 2008) (citation omitted). It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination. *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003).

Termination of parental rights is controlled by Section 2511 of the Adoption Act, 23 Pa. C.S.A. Section 2511. In this case, CYS seeks termination of both parents' parental rights on the following grounds:

**Section 2511. Grounds for Involuntary Termination**

(a)     General Rule. – The rights of a parent in regard to a child may be terminated after a petition filed any of the following grounds:

(1)     The parents have, for a period of more than six (6) months prior to the filing of this petition, failed to perform their parental duties;

(2)     The repeated and continued incapacity, abuse, neglect or refusal of the parents has caused the child to be without essential parental care, control or subsistence necessary for his physical and mental well-being and the conditions and causes of the inability, abuse, neglect or refusal have not been remedied by the parents;

\* \* \*

(5)     The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.]

\* \* \*

(8)     The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

2

(b) Other considerations – The court in terminating the rights of a parent shall give primary consideration of the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa. C.S.A. Section 2511(a)(1), (2), (5), (8), and (b). Satisfaction of any subsection of Section 2511(a), along with consideration of Section 2511(b), is sufficient for involuntary termination of parental rights. *In re K.Z.S., supra; In re R.J.S.*, 901 A.2d 502 (Pa. Super. 2006). Accordingly, an appellate court "need only agree with the orphan's court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *app. den.*, 863 A.2d 1141 (Pa. 2004). *See also In re Adoption of C.J.P.*, __ A.3d __, 2015 PA Super 80, 2015 WL 1668310 (Pa. Super, filed April 15, 2015); *In re K.H.B.*, 107 A.3d 175 (Pa. Super. 2014).

Section 2511 requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

3

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). *See also In re Adoption of C.J.P., supra; In re T.D., supra; In re Adoption of R.J.S., supra.*

In analyzing the conduct of a parent, the applicable statutory language must be considered. As the third sentence of Section 2511(b) directs, when subsections (a)(1), (6), or (8) of Section 2511(a) are cited as the grounds for termination, we may not consider actions of a parent to remedy the conditions that necessitated the dependent child's placement which are initiated after the parent receives notice of the filing of the termination petition. *In re Adoption of C.J.P., supra; In re K.Z.S., supra; In re D.W.*, 856 A.2d 1231 (Pa. Super. 2004).

Under Section 2511(a)(1), parental rights may be terminated if, for a period of at least six months, a parent *either* demonstrates a settled purpose of relinquishing parental claims to a child *or* fails to perform parental duties. *In re Adoption of R.J.S., supra; In re Adoption of J.M.M.*, 782 A.2d 1024 (Pa. Super. 2001). As the Superior Court has explained:

> A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the court must consider the whole history of a given case and not mechanically apply the six-month statutory provision.

*In re K.Z.S., supra* at 758 (Pa. Super. 2008) (case citations and quotation marks omitted). *See also In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010).

The grounds for termination of parental rights under Section 2511(a)(2), due to

4

parental incapacity that cannot be remedied, are not limited to affirmative misconduct. Rather, those grounds may include acts of refusal as well as incapacity to perform parental duties.

> Parental rights may be terminated pursuant to Section 2511(a)(2) if three conditions are met: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.
>
> Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental wellbeing. 23 Pa.C.S.A. § 2511(a)(2). Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and **strong, continuous parental ties**, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it…. Further, grounds for termination under subsection (a)(2) are not limited to affirmative misconduct; those grounds may include acts of incapacity to perform parental duties.

*In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (case citations and internal quotation marks omitted) (emphasis in original). *See In re Adoption of R.J.S., supra.* Thus,

> While sincere efforts to perform parental duties can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.

*In re Z.P.*, 994 A.2d at 1117-18 (case citations and internal quotation marks omitted). Moreover, a court may terminate parental rights under subsection (a)(2), even where the parent has never had physical custody of the child. *In re Adoption of Michael J.C.*, 486 A.2d 371, 375 (Pa. 1984); *In re Z.P, supra.*

For termination under Section 2511(a)(5), "the following factors must be demonstrated: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child." *In re K.H.B.*, 107 A.3d 175 (Pa. Super. 2014) (quoting *In re Adoption of M.E.P.*, 825 A.2d 1266, 1273–74 (Pa.Super.2003)). *See also In re Adoption of K.J.*, 936 A.2d 1128, 1133 (Pa. Super. 2007), *app. den.*, 951 A.2d 1165 (Pa. 2008).

To terminate parental rights under Section 2511 (a)(8), the party seeking termination of parental rights need only show "(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to the removal or the placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of R.J.S.*, *supra* at 511. *See In re Adoption of M.E.P.*, 825 A.2d 1266 (Pa. Super. 2003). "Unlike Section 2511(a)(5), Section 2511(a)(8) does not require an evaluation of the remedial efforts of either the parent...Instead, Section 2511(a)(8) imposes a lengthier removal

6

period of one year." *In re B.C.*, 36 A.3d 601, 611 (Pa. Super. 2012) (citing *C.L.G.*, 956 A.2d at 1007).

The one year time period is significant. As the Superior Court has explained:

> Section 2511(a)(8) sets a twelve–month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the twelve-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of DHS supplied over a realistic period. The relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing. This Court has acknowledged:
>
>> [T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*In re I.E.P.*, 87 A.2d 340, 345-46 (Pa. Super. 2014) (case citations and internal quotation marks omitted).

With respect to the "needs and welfare" analysis pertinent to Sections (a)(8) and (b), the Superior Court has observed:

> [I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the 'needs and welfare of the child' prior to proceeding to Section 2511(b), which focuses on the 'developmental, physical and emotional

7

needs and welfare of the child.' Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,' we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the 'needs and welfare' of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re Adoption of C.L.G.*, 956 A.2d 999, 1008–1009 (Pa. Super. 2008) (*en banc*) (citations omitted). *See also In re I.E.P., supra; In re Adoption of K.J.*, 936 A.2d 1128, 1133 (Pa. Super. 2007), *app. denied*, 951 A.2d 1165 (Pa. 2008). While the Superior Court focused its analysis in these cases on Section 2511(a)(8), we believe that the rationale applies equally to Section 2511(a)(5). Like Section (a)(8), Section (a)(5) requires a finding that termination would best serve the needs and welfare of the child. Accordingly, we must reach that determination before turning to Section 2511(b).

Simply put, Section 2511, including the subsections cited and explained above, outlines certain irreducible requirements that parents must provide for their children. Parents who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have their parental rights terminated. *In re K.Z.S., supra; In re B.L.L.*, 787 A.2d 1007 (Pa. Super. 2001).

There is no simple or easy definition of parental duties. However, the appellate cases make it very clear that parenting is an active rather than a passive obligation that,

8

even in the face of difficulty, adversity, and incarceration, requires a parent to take and maintain a place of importance in the child's life. The following passage is instructive:

> Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

> \* \* \*

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re K.Z.S.,* *supra* at 759. *See also In re Burns,* 379 A.2d 535 (Pa. 1997); *Adoption of Baby Boy A. v. Catholic Social Services of the Diocese of Harrisburg,* 517 A.2d 1244 (Pa. 1986); *In re Shives,* 525 A.2d 801 (Pa. Super. 1987).

In relation to the parental requirements outlined in Section 2511, when a parent is separated from his or her child, it is incumbent upon the parent "to maintain communication and association with the child. This requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert himself, to take and maintain a place of importance in the child's life." *In re G.P.-R.,* 851 A.2d 967, 977 (Pa. Super. 2004). When a parent has abandoned or effectively abandoned a child,

> [t]o be legally significant, the post abandonment contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also

9

demonstrate a willingness and capacity to understand the parental role. ***The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.***

*In re T.D.*, 949 A.2d at 919 (case citations and brackets omitted) (emphasis in original).

Finally, parents are required to make diligent efforts towards assumption or resumption of full parental responsibilities. Accordingly, a parent's vow to cooperate, after a long period of being uncooperative regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *In re Adoption of K.J., supra; In re A.L.D.*, 797 A.2d 326 (Pa. Super. 2002).

Once statutory grounds for termination have been established, the court must, in accordance with Section 2511(b), consider whether the child's needs and welfare will be met by termination. A proper Section 2511(b) analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. Intangibles such as love, comfort, security, and stability are involved in the inquiry. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond, if any, between parent and child. If a bond is determined to exist, the effect on the child of permanently severing the bond must be analyzed and considered. *See In re K.M.*, 53 A.3d 781 (Pa. Super. 2012); *In re T.D., supra; In re L.M., supra; In re Adoption of R.J.S., supra*. As to the bond analysis, the Superior Court has stated:

> in conducting a bonding analysis, the court is not required to use expert testimony, but may rely on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the

10

child's life, and the resulting bond with the natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa.Super.2008).

*In re K.H.B.*, 107 A.3d 175, 180 (Pa. Super. 2014).

In addition to a bond examination, a court may equally

> emphasize the **safety** needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security, and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent-child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

*In re K.Z.S.*, 946 A.2d at 763 (emphasis in original).

When, as here, the petitioner is an agency, "it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists." 23 Pa.C.S. § 2512(b). However, the existence or absence of a pre-adoptive home is an important factor. So is the relationship between the child and the foster or pre-adoptive parents. As our Supreme Court cogently stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. *In re: T.S.M.*, 71 A.3d 251, 268 (Pa. 2013). *See In re K.M., supra.*

In reviewing evidence in support of termination under section 2511(b), our Supreme Court recently stated:

> [I]f the grounds for termination under subsection (a) are met, a court 'shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.' 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include

11

'[i]ntangibles such as love, comfort, security, and stability. In In re E.M., [620 A.2d 481, 485 (Pa. 1993) ], this Court held that the determination of the child's 'needs and welfare' requires consideration of the emotional bonds between the parent and child. The 'utmost attention"' should be paid to discerning the effect on the child of permanently severing the parental bond.

In re T.S.M. 71 A.3d at 267. The Court additionally observed:

contradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved....Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes. [ASFA was enacted to combat the problem of foster care drift, where children, like the children in this case, are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children.

12

*In re T.S.M.,* 71 A.3d at 269.

In this case, both parents were incarcerated early on in the dependency case, and Mother remained on probation supervision up through most if not all of both cases. Standing alone, incarceration neither constitutes sufficient grounds for termination of parental rights nor removes the obligation to perform required "bond effects" and "needs and welfare" analyses. However, it is a factor that must be considered and, in a proper case, such as when a parent is serving a prohibitively long sentence, may be determinative. *In re Adoption of S.P.,* 47 A.3d 817 (Pa. 2012); *In re Z.P., supra.* "Each case of an incarcerated parent facing termination must be analyzed on its own facts, keeping in mind...that the child's need for consistent parental care and stability cannot be put aside or put on hold simply because the parent is doing what [he or] she is supposed to be doing in prison." *In re E.A.P.,* 944 A.2d at 84.

The analysis depends in part on the asserted grounds for termination. In subsection (a)(1) abandonment cases, our Supreme Court has stated:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*In re Adoption of S.P.,* 47 A.3d at 828 (quoting *In re Adoption of McCray,* 331 A.2d 652, 655 (Pa. 1975) (footnotes and internal quotation marks omitted). Thus, in an abandonment case, a parent is required to *both* utilize available resources *and* take affirmative steps to support a parent-child relationship. If the parent fails to do so, his

13

parental rights may be terminated. *See In re Adoption of W.J.R.*, 952 A.2d 680 (Pa. Super. 2008); *In re E.A.P., supra; In re K.J., supra.* However, utilization of available resources does not guarantee preservation of parental rights. The statutory criteria, the facts and circumstances of each case, and the best interests, needs, and welfare of the child must all still be considered.

In cases involving parental incapacity, our Supreme Court recently held that:

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*In re Adoption of S.P*, 47 A.3d. at 828. In more expanded terms, the Supreme Court stated:

> In line with the expressed opinion of a majority of justices in [*In re R.I.S.*, 614 Pa. 275, 36 A.3d 567 (2011) ], our prior holdings regarding incapacity, and numerous Superior Court decisions, we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

*Id.* at 830. In sum, a parent's incarceration "is relevant to the subsection (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the "essential parental care, control or subsistence" that the section contemplates." *In re A.D.*, 93 A.3d at 897.

14

Finally, before filing a petition for termination of parental rights, the Commonwealth is generally required to make reasonable efforts to promote reunification of parent and child. *In re Adoption of R.J.S.. See also In re Adoption of M.E.P.*, 825 A.2d 1266 (Pa. Super. 2003). However, the Commonwealth does not have an obligation to make reunification efforts indefinitely.

> The Commonwealth has an interest not only in family reunification but also in each child's right to a stable, safe, and healthy environment, and the two interests must both be considered. A parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the parent's failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment. When reasonable efforts to reunite a foster child with his or her biological parents have failed, then the child welfare agency must work toward terminating parental rights and placing the child with adoptive parents. The process of reunification or adoption should be completed within eighteen (18) months. While this time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re Adoption of R.J.S.*, supra at 507 (internal case citations, quotation marks, and footnote omitted).

However, the failure of an agency to make reasonable efforts to promote reunification of parent and child will not defeat a properly supported petition for termination of parental rights. Neither the relevant provisions of Section 2511 nor the pertinent provisions of the Juvenile Act require a court to consider the reasonable efforts provided to a parent by the petitioning agency prior to termination of parental rights. *In re D.C.D.*, 105 A.3d 662 (Pa. 2014); *In re Adoption of C.J.P.*, supra. In *In re D.C.D.*,

15

our Supreme Court analyzed the language of Section 2511(a)(2) of the Adoption Act, as well as Section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351. The Court reasoned that, while "reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child," neither of these provisions, when read together or individually, requires reasonable efforts. *Id.* at 671–75 (citation omitted). The Court also concluded that reasonable efforts were not required to protect a parent's constitutional right to the care, custody, and control of his or her child. *Id.* at 676–77. While the Supreme Court in *D.C.D.* focused its analysis on Section 2511(a)(2), we find the Supreme Court's reasoning equally applicable to Section 2511(a)(8). Like Section 2511(a)(2), nothing in the language of Section 2511(a)(8) suggests that reasonable reunification services are necessary to support the termination of parental rights.

*In re Adoption of C.J.P.*, supra at *7. *See also In re B.C.*, 36 A.3d at 611 (Section 2511(a)(8) does not require an evaluation of the remedial efforts of either the parent or the agency); *In re C.L.G.*, supra. Along similar lines, when the goal of the case is adoption, the adequacy of the agency's efforts toward reunification is generally not a concern at the termination of parental rights stage. *In re B.L.W.*, 843 A.2d 380, 384 n.1 (Pa. Super. 2004) (*en banc*), *app. den.* 863 A.2d 1141 (Pa. 2004). Expanding on the analyses contained in the cited cases, we find that the reasoning of our Supreme Court and Superior Court is equally applicable to Section 2511(a)(1) which, like Sections 2511(a)(2) and (8), does not suggest that reasonable reunification services are necessary to support the termination of parental rights. Thus, while agencies must provide reasonable efforts to enable parents to work toward reunification with their dependent children when ordered to do so, "the remedy for an agency's failure to provide services is not to punish an innocent child, by delaying her permanency through denying termination, but instead to conclude on the record that the agency has failed to

make reasonable efforts, which imposes a financial penalty on the agency of thousands if not tens of thousands of dollars under federal law." *In re D.C.D.*, 105 A.3d at 675.

2.      Permanency and Placement Review

The applicable standards are recited in the memorandum opinion issued in the dependency proceeding by the Superior Court on August 22, 2014, and the appeal opinion issued by this Court on April 11, 2014.

3.      Appellate Standard of Review

If an appeal is filed, the applicable standard of review is summarized in the appeal opinion we filed in the dependency case on April 11, 2014.